JOY OIL COMPANY, LTD., *v.* STATE TAX COMMISSION.

1. COMMERCE—BILL OF LADING—EXPORT—STORAGE PENDING TRANSSHIPMENT—CONTINUITY OF TRANSPORTATION.

Where gasoline was shipped by refineries by rail for delivery to foreign corporation, not authorized to do business in this State, which placed it in storage tanks in this State for 18 months before transshipment by boat, the continuity of transportation in foreign commerce was interrupted thereby and the marking of the railroad bill of lading "for export to Canada" did not make the transportation by railroad and ship continuous (U. S. Const. art. 1, §§ 9, 10).

2. SAME—TAXATION—CONTINUITY OF TRANSPORTATION—QUESTION OF FACT.

Whether or not a State in which goods are stored may levy a tax depends upon whether there is a continuity of transportation in interstate or foreign commerce, a question of fact dependent upon the circumstances of each individual case. (U. S. Const. art. 1, §§ 9, 10).

---

REFERENCES FOR POINTS IN HEADNOTES

[1-4] Breaking continuity of passage or shipment as affecting its interstate character. 60 A.L.R. 1465.

[1-7] 11 Am. Jur., Commerce, §§ 70–72, 74; 51 Am. Jur., Taxation, §§ 204, 205.

[1-7] Beginning of interstate transportation which excludes State taxation. 25 A.L.R. 1201.

[1-7] When may the transit of goods, commenced in another State, be deemed to have been definitely interrupted or to have terminated, so as to subject the goods to local taxation. 52 L. Ed. 755; 78 L. Ed. 138.

3. SAME—BREAK IN CONTINUITY OF TRANSPORTATION—CONVENIENCE OF CONSIGNEE—EXEMPTION FROM TAXATION.

Where break in the continuous shipment of gasoline from refineries within this State to Canada at a place within this State was for the profit and convenience of the consignee, a foreign corporation not authorized to do business in this State, and gasoline remained in storage here for some 18 months, it was not exempt from ad valorem taxation within this State (U. S. Const. art. 1, §§ 9, 10).

4. SAME—CONTINUITY OF TRANSPORTATION.

The point of time when goods in interstate or foreign commerce begin to be governed by the national law is that moment when they commence their final continuous movement for transportation from State of origin to that of their destination.

5. SAME—STATE JURISDICTION—TAXATION.

The point of time when State jurisdiction over commodities in interstate or foreign commerce begins and ends should be clearly defined so as to avoid all ambiguity or question, especially in the matter of taxation.

6. SAME—BILLS OF LADING—DESTINATION—PURPOSE OF SHIPMENT.

Fact that bills of lading for shipment of gasoline by rail to Detroit as the destination were marked "for export to Canada" did not change their destination.

7. SAME—MOVEMENT IN INTERSTATE OR FOREIGN COMMERCE—TAXATION BY STATE.

If the interstate or foreign movement of goods has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the State's power to tax it.

Appeal from State Tax Commission. Submitted April 7, 1948. (Docket No. 17, Calendar No. 44,000.) Decided May 18, 1948. Certiorari granted by the Supreme Court of the United States October 11, 1948.

Certiorari by Joy Oil Company, Ltd., a Canadian corporation, to review an order of the State Tax Commission sustaining the board of review of the City of Dearborn in taxing plaintiff's property. Order affirmed.

*Shields, Ballard, Jennings & Bishop,* for plaintiff.

*Eugene F. Black,* Attorney General, and *Edmund E. Shepherd,* Solicitor General, for defendant State Tax Commission.

*Dale H. Fillmore,* Corporation Counsel, and *Joel K. Underwood,* Deputy Corporation Counsel, for City of Dearborn.

Boyles, J.   The question here for decision is whether a quantity of gasoline stored in tanks in the city of Dearborn pending transshipment to Canada is liable for an ad valorem tax.   The facts are not in dispute and, as hereinafter shown, control decision.

On December 29, 1945, the appellant Joy Oil Company, Ltd., a Canadian corporation not authorized to do business in Michigan, purchased 1,500,000 gallons of gasoline from the Mid-West Refineries, shipped it by rail from Grandville and Alma to itself as consignee, at Detroit, and stored it in large storage tanks in Dearborn pending transshipment to Canada.   The bills of lading from the Pere Marquette railroad were each marked "For export to Canada."   However, the bills of lading were not through bills from Grandville and Alma to Toronto, Canada, but the shipments were consigned to appellant at Detroit, the place of delivery being within a few feet of the boundary line between Detroit and Dearborn, and the storage tanks being near the railroad siding but over the line in Dearborn.   All of the bills of lading were issued in January, 1946, the shipments were made beginning in January and accumulated until some time in February when the final delivery was made to appellant at said storage tanks leased by it located in the city of Dearborn.

On April 1, 1947, all of the above gasoline was in said tanks with the exception of a small amount which had previously been exported to Canada by

truck over the Ambassador bridge. Further movement of gasoline across said bridge was stopped by the authorities and there was a delay of about 18 months before said gasoline in storage was transported to Canada. Commencing in July, 1947, the gasoline was transported to Canada by boat.

On April 1, 1947, the city of Dearborn assessed said gasoline for ad valorem taxes, and the tax now amounts to $1,825.93. Appellant appealed from said assessment to the board of review of the city of Dearborn, which sustained the tax; whereupon appellant appealed to the Michigan State tax commission, where the tax was again upheld. On leave granted Joy Oil Company, Ltd., now prosecutes an appeal to this Court in the nature of certiorari from said decision of the State tax commission.

It is the claim of the appellant that the gasoline in question was a commodity in foreign commerce, and that the city of Dearborn is precluded from imposing the tax under the export-import clause of the United States Constitution.

Summarizing the factual situation, said gasoline was shipped intrastate by rail to appellant in Dearborn, stored there about 18 months in leased tanks, then transshipped by boat to Canada, and on April 1, 1947, after the gasoline had been stored in Dearborn about 15 months the city assessed it for ad valorem taxes. Was it exempt, as a commodity in foreign commerce?

The pertinent provisions of the United States Constitution are as follows:

"The Congress shall have power   *   *   *

"(3)   To regulate commerce with foreign nations, and among the several States, and with the Indian tribes." Art. 1, § 8.

"No tax or duty shall be laid on articles exported from any State." Art. 1, § 9(5).

"No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws: and the net produce of all duties and imports, laid by any State on imports or exports, shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the Congress." Art. 1, § 10(2).

In support of its claim that the gasoline in question was exempt from taxation by the city of Dearborn, appellant relies on the principles of law laid down in the following cases: *A. G. Spalding & Bros.* v. *Edwards,* 262 U. S. 66 (43 Sup. Ct. 485, 67 L. Ed. 865); *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95 (49 Sup. Ct. 292, 73 L. Ed. 626); *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U. S. 69 (67 Sup. Ct. 156, 91 L. Ed. 80).

But the facts in the case at bar do not fit into the principles of law announced in the above decisions. In the *Spalding Case, supra,* the transportation was practically continuous from the time the shipment of merchandise was started by rail until the merchandise was placed on board ship at seaboard to continue the transportation to the purchaser in Venezuela. Spalding, the shipper (corresponding to the Mid-West Refineries in the case at bar), was directed to deliver the merchandise to the Atlantic & Caribbean Steam Navigation Company in New York, and did so. The collector of internal revenue in New York levied an excise tax on the merchandise shipment and the court set the tax aside. In so doing, the court said:

"The very act (of the shipper) that passed the title and that would have incurred the tax had the transaction been domestic, committed the goods to the carrier that was to take them across the sea, for the purpose of export and with the direction to the for-

eign port upon the goods. The expected and accomplished effect of the act was to start them for that port."

Such was not the situation in the case at bar, where the gasoline was shipped by the refineries by rail for delivery to the appellant at Detroit, and the continuity of transportation was interrupted there by placing the gasoline in storage tanks where it remained for approximately 18 months before appellant procured ship transportation for Canada. Under these circumstances, marking the railroad bills of lading "For export to Canada" did not make the transportation by railroad and ship a continuous one within the circumstances of the *Spalding Case.*

The question whether the State in which the goods are stored may levy a tax depends upon whether there is a continuity of transportation. In turn, this becomes a question of fact, and depends upon the circumstances of each individual case. In the *Carson Petroleum Co. Case, supra,* relied upon by appellant, oil was purchased by the Carson company in various States, transported by railroad tank cars, and unloaded into storage tanks at St. Rose, a few miles above New Orleans, for shipment to foreign ports. The rail shipments were on an export rate, lower than the domestic rate. The oil was of a grade made especially for export. The tanks and equipment at St. Rose were made especially for unloading oil from tank cars and loading it aboard ships for export. No oil was sold there and the only business conducted was transfer of the oil from tank cars into storage tanks for reloading into ships. The journey was made as continuous as possible, depending on the quantity of oil on hand and the capacity of ships available for export. The court found:

"On account of the demurrage charges on tank cars, as well as on steamships, it would be impracticable to carry on the export oil business by any other method than by storing the oil in large storage tanks as the train loads of oil arrive, and shipping from the accumulation when the ships arrive. The oil is shipped from the storage tanks in the same condition in which it was received from the tank cars, without being treated in any way. The oil is never kept on hand at St. Rose any longer than is necessary. The quantity on hand is always awaiting either the arrival of a ship or the accumulation of a sufficient quantity to load a ship. * * *

"The crucial question to be settled in determining whether personal property or merchandise moving in interstate commerce is subject to local taxation is that of its continuity of transit."

After discussing many cases the court held that the transportation in that case was continuous, and in its conclusion referred to other decisions with the following comment:

"The quickness of transshipment in both cases was the chief object each exporter plainly sought. In both cases the selection of the point of shipment and the equipment at that point were solely for the speedy and continuous export of the product abroad, and for no other purpose."

In the *Richfield Oil Corp. Case, supra,* mainly relied upon by appellant, the facts likewise distinguish the case from the one at bar. The Richfield Oil Corporation was engaged in producing and selling oil in California. It transported its oil by pipe line from its refinery to its storage tanks at seaboard and there pumped the oil into vessels in foreign commerce. Its delivery was "to the order of the Naval Secretary, Navy Office, Wellington, into N. Z. Naval tank steamer R. F. A. 'Nucula' at Los Angeles, California," to be consigned to the naval-officer-in-charge at Auck-

land, New Zealand. The State of California levied a tax on the oil under the State retail sales tax act. The United States supreme court held that the tax was unconstitutional under article 1, § 10, of the United States Constitution hereinbefore quoted. The continuity of the movement by pipe line and by shipload to the foreign port was not substantially interrupted.

In the case at bar, the destination of the gasoline on the original rail shipments was Detroit, Michigan. If the rail shipments had been billed to Toronto, Canada, the transportation might have been continuous by rail across or under the Detroit river, to Canada. The break of the continuous shipment at Dearborn was for the profit and convenience of the appellant, to use ship movement to Toronto at a lower rate. The gasoline remained in storage in Dearborn for about 15 months, until on tax day, April 1, 1947, it was assessed by the city for ad valorem taxes. It was not transshipped by boat to Canada for approximately three months thereafter. There was no continuity of transportation at Detroit or Dearborn which would require exemption from taxation under the decisions relied upon by appellant.

In *Coe* v. *Errol*, 116 U. S. 517 (6 Sup. Ct. 475, 29 L. Ed. 715), often referred to as the leading case, logs cut during the winter in New Hampshire were hauled to a river town in that State, to be floated by river to a place in Maine. They were detained in New Hampshire by low water, and while still there were assessed for taxes. The court upheld the tax, saying:

"There must be a point of time when they cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for

transportation from the State of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State. Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the State. * * *

"The point of time when State jurisdiction over the commodities of commerce begins and ends is not an easy matter to designate or define, and yet it is highly important, both to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question. * * *

"But no definite rule has been adopted with regard to the point of time at which the taxing power of the State ceases as to goods exported to a foreign country or to another State. What we have already said, however, in relation to the products of a State intended for exportation to another State will indicate the view which seems to us the sound one on that subject, namely, that such goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey."

Counsel for appellant relies on cases holding that the shipment is in interstate (*ergo,* foreign) transportation when delivery is made by the shipper for transportation by rail to another State. These decisions might apply to the case at bar if the original delivery of gasoline had been made by bill of lading for Toronto, Canada. On the contrary, the gasoline was billed for shipment by rail to Detroit as the destination. The notation on the bills of lading "For export to Canada" did not change the destination. As said in *Minnesota* v. *Blasius,* 290 U. S. 1, at page 9 (54 Sup. Ct. 34, 78 L. Ed. 131):

"The 'crucial question,' in determining whether the State's taxing power may thus be exerted, is that of 'continuity of transit.' *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95, 101 (49 Sup. Ct. 292, 73 L. Ed. 626).

"If the interstate movement has not begun, the mere fact that such a movement is contemplated does not withdraw the property from the State's power to tax it. *Coe* v. *Errol,* 116 U. S. 517 (6 Sup. Ct. 475, 29 L. Ed. 715); *Diamond Match Co.* v. *Ontonagon,* 188 U. S. 82 (23 Sup. Ct. 266, 47 L. Ed. 394)."

It must be admitted that excerpts from many cases could be quoted in support of appellant's contention here. But the fundamental rule of law in these cases is that decision depends upon what is meant by continuity of transportation, and in turn this depends upon the facts of each case. Under the circumstances of the case at bar, we conclude that there was no continuity of transportation from the point of shipment to destination in foreign commerce. The gasoline in Dearborn on April 1, 1947, was subject to ad valorem taxation.

Affirmed, with costs.

BUSHNELL, C. J., and SHARPE, REID, NORTH, DETHMERS, BUTZEL, and CARR, JJ., concurred.