## JOY OIL CO., LTD. *v.* STATE TAX COMMISSION.

No. 223.   Argued January 6–7, 1949.—Decided June 13, 1949.

*Clayton F. Jennings* argued the cause and filed a brief for petitioner.

*Edmund E. Shepherd,* Solicitor General of Michigan, argued the cause for respondent.   With him on the brief were *Eugene F. Black,* Attorney General, *Daniel J. O'Hara,* Assistant Attorney General, *Dale H. Fillmore* and *Joel K. Underwood.*

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

On December 29, 1945, petitioner Joy Oil Company, Ltd., a Canadian corporation, purchased 1,500,000 gal-

lons of gasoline from Mid-West Refineries, Inc., of Grand Rapids, Michigan. The bills of lading issued by the railroad to which the gasoline was delivered were marked "For Export to Canada," but the gasoline was consigned to petitioner at Detroit. In order to secure the benefits of lower export freight rates and exemption from the federal transportation and manufacturers' excise taxes, petitioner furnished Mid-West Refineries and the railroad with prescribed forms certifying that the gasoline was purchased for export. Rail shipments were begun in January and completed in February of 1946. As the gasoline reached Detroit it was accumulated in storage tanks leased by petitioner at Dearborn.

On April 1, 1947, the city of Dearborn assessed an *ad valorem* property tax on the gasoline, all of which, except 50,000 gallons, shipped to Canada by truck over the Ambassador Bridge, had then been in the Dearborn tanks for fifteen months. Shipment by truck was halted by a federal regulation prohibiting the transportation of inflammables over any international bridge, and petitioner apparently chose not to ship the gasoline by rail across the Detroit River. In July of 1947 petitioner began to ship it to Canada by water; the last tanker load departed on August 22, 1947. Petitioner explains the delay as due to inability to obtain shipping space at any earlier date.

Petitioner resisted payment of the tax on the ground that it infringed Art. I, § 10, cl. 2, of the Constitution. The Tax Commission of Michigan sustained Dearborn's assessment of the tax, and the Supreme Court of Michigan affirmed. 321 Mich. 335, 32 N. W. 2d 472. We granted certiorari because the case presented a sufficiently important question in the accommodation of State and Federal interests under the Constitution. 335 U. S. 812.

The circumstances which tended, at the time when the tax was assessed, to establish petitioner's intent to export the gasoline and the fact that the gasoline was eventually exported are not enough, by themselves, to confer immunity from local taxation. See, e. g., *Cornell* v. *Coyne,* 192 U. S. 418; *Empresa Siderurgica* v. *County of Merced,* 337 U. S. 154. Nor is it enough that by the rail shipment to Detroit one step in the process of exportation had been taken or that a part of the total bulk had already departed for its foreign destination. It is of course true that commodities destined for shipment by water must be transshipped at the water's edge and so may require a brief period of storage at that point which will not be deemed a delay sufficient to interrupt the continuity of the export process. *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95; see *Southern Pacific Terminal Co.* v. *Interstate Commerce Comm'n,* 219 U. S. 498; *Texas & N. O. R. Co.* v. *Sabine Tram Co.,* 227 U. S. 111. But here the period of storage at Dearborn was so long as to preclude holding that the first step toward exportation would inevitably be followed by others. See, by way of contrast, *Hughes Bros. Timber Co.* v. *Minnesota,* 272 U. S. 469. While in storage, the gasoline might have been diverted to domestic markets without disruption of any existing arrangement for its transshipment and without even breach of any contractual commitment to a foreign purchaser. Neither the character of the property nor any event equivalent to its redelivery to a common carrier made export certain for all practical purposes. See *Richfield Oil Corp.* v. *State Board,* 329 U. S. 69, 82.

The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services. See *Coe* v. *Errol,*

116 U. S. 517, 527–28. The fifteen-month delay at Dearborn barred immunity of petitioner's gasoline from the taxing power of the municipality.

*Affirmed.*

MR. CHIEF JUSTICE VINSON, with whom MR. JUSTICE DOUGLAS and MR. JUSTICE JACKSON join, dissenting.

The Court holds that fifteen months' delay in transshipment of the gasoline in question was so long that continuity of the process of exportation was broken, because during that period it might have been diverted to domestic markets. I think that this rationale and the conclusion which follows therefrom mark a substantial and unwarranted departure from our previous decisions in this field.

As I understand it, the Court's opinion reflects the view that a long delay in transshipment makes it uncertain whether the gasoline will eventually be exported, and further, that a delay of fifteen months makes it possible for this Court to say as a matter of law that the uncertainty is so great that the process of exportation has ceased, whatever the reason for the delay. But the Court concedes that petitioner intended to export the gasoline at the time the tax was imposed, and petitioner's uncontradicted evidence shows that it had that intent throughout the period of delay, which was caused by its inability to procure water transportation. That intent was manifested in a number of ways. The bills of lading by which the gasoline moved from Grandville and Alma, Michigan, to Dearborn, a Great Lakes port, were marked "For Export to Canada"; petitioner certified that the gasoline was to be exported in order to secure an exemption under the federal manufacturer's excise tax and to qualify for lower freight rates accorded exports; it transported 50,000 gallons of the gasoline by truck over the Ambassador Bridge

into Canada until a federal regulation closed the bridge
to inflammable materials; and finally, petitioner exported
all of the gasoline to Canada when shipping space be-
came available. There is nothing in the record to indi-
cate either that petitioner at any time deviated from that
expressed intent, or that the delay was not due solely to
lack of shipping space.

The Court is in the anomalous position, therefore, of
holding as a matter of law that a fifteen-month delay in
transshipment breaks the "stream of export" because of
the resulting uncertainty that the goods will ultimately
be exported, when all of the evidence is to the effect that
the shipper's intent to export has never wavered; that
exportation was as certain as of the date of the tax as it
had been fifteen months before. The Court has previ-
ously considered the question to be quite a different one.
We have held that

> "The character of the shipment in such a case de-
> pends upon all the evidential circumstances looking
> to what the owner has done in the preparation for
> the journey and in carrying it out. The mere power
> of the owner to divert the shipment already-started
> does not take it out of interstate commerce, if the
> other facts show that the journey has already begun
> in good faith and temporary interruption of the pas-
> sage is reasonable and in furtherance of the intended
> transportation, as in the *Champlain* case." *Hughes
> Brothers Timber Co.* v. *Minnesota,* 272 U. S. 469,
> 475–476 (1926).

This test was quoted with approval by Mr. Chief Justice
Hughes in *Minnesota* v. *Blasius,* 290 U. S. 1, 10 (1933),
and he added, "The question is always one of substance,
and in each case it is necessary to consider the particular
occasion or purpose of the interruption during which the
tax is sought to be levied." See also to the same effect,

*Champlain Realty Co.* v. *Town of Brattleboro,* 260 U. S. 366, 377 (1922); *Carson Petroleum Co.* v. *Vial,* 279 U. S. 95, 102 (1929); *United States* v. *Erie R. Co.,* 280 U. S. 98, 102 (1929).' The Court now refuses to look at any circumstances except the delay—not even the reason for the delay.

It is true that petitioner could have moved the gasoline more quickly had it used the more expensive all-rail service. But in almost every case of delay a quicker method of moving the goods might have been devised. No doubt the logs held up by low water in *Coe* v. *Errol,* 116 U. S. 517 (1886), could have been drawn overland by mules or oxen. And it would have been possible, though not practical, for oil to have been transferred directly from tank cars to waiting ships in *Carson Petroleum Co.* v. *Vial, supra,* yet this Court found that the delay necessarily attendant upon the accumulation of oil in tanks at the waterfront to await the arrival of ships did not constitute interruption of the process of exportation. The delay was "reasonable and in furtherance of the intended transportation."

Concededly, the gasoline here involved was in the process of exportation when taxed unless the delay was alone enough to break the stream of export. It had been started on its journey with every indication that it was to be transshipped for export. If actual exportation had followed its arrival in Dearborn by a few days or weeks, there is no question that it would have been a commodity in the process of exportation and thus exempt from tax. In this situation, the Court has always, until today, applied "a liberal construction of what is continuity of the journey, in cases where the Court finds from the circumstances that export trade has been actually intended and carried through." *Carson Petroleum Co.* v. *Vial, supra* at pp. 105–106. But the Court now treats as immaterial the fact that the process of exportation had

started, which has always been considered the decisive factor, *Cornell* v. *Coyne,* 192 U. S. 418 (1904), *Empresa Siderurgica* v. *County of Merced,* 337 U. S. 154 (1949), and assumes that a delay of fifteen months conclusively demonstrates that certainty of exportation had been undermined. It is almost always possible in cases of this kind that the owner of the goods may change his mind before exportation is actually carried out, as Mr. Justice Holmes pointed out in *Spalding & Bros.* v. *Edwards,* 262 U. S. 66, 70 (1923). Delay undoubtedly increases the possibility, but it does not work such a change as a matter of law. The question, instead, is that previously pointed out, namely, whether "the journey has already begun in good faith and [whether] temporary interruption of the passage is reasonable and in furtherance of the intended transportation." *Hughes Brothers Timber Co.* v. *Minnesota, supra,* at 476.

The result is that the Court, without consideration of the fact that the gasoline had been started on its journey with the intent that it be transshipped for immediate export to Canada, holds that fifteen months' unavoidable delay is so productive of uncertainty that the process of exportation ceases as a matter of law. It might be pointed out that in the leading case of *Coe* v. *Errol, supra,* logs being floated down a river were held up by low water for about a year, but this Court did not consider that delay enough to break the continuity of the interstate journey. The line now seems to be drawn somewhere between twelve and fifteen months, whatever the other circumstances. Such an arbitrary demarcation is hardly consonant with "the liberal protection that hitherto [exports] have received." *Spalding & Bros.* v. *Edwards, supra,* at p. 70. I would adhere to the test set out in our previous decisions: whether the delay was reasonable under all the circumstances and in furtherance of the intended transportation.