MICHIGAN CONSOLIDATED GAS COMPANY
*v.* AUSTIN TOWNSHIP.

1. TAXATION—INTERSTATE COMMERCE—BREAK IN TRANSIT.

States may not tax property in transit in interstate commerce, but where the property has come to rest within a State by reason of a break in the transit it becomes subject to the power of the State to impose a nondiscriminatory property tax unless Congress with paramount authority over the subject, substitutes its own regulation.

2. COMMERCE—INTERSTATE COMMERCE—TEMPORARY INTERRUPTION OF CONTINUITY OF MOVEMENT.

The interstate movement of property may be regarded as continuing, so as to maintain the immunity from State taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement, it being a question of substance as to the particular occasion or purpose of the interruption during which the tax is sought to be levied.

3. TAXATION—INTERSTATE COMMERCE—JURISDICTION OF STATE TAXING UNIT.

A State taxing unit may impose an ad valorem tax for local business purposes upon property which has been in interstate commerce but which has come to rest within the taxing jurisdiction, since the property will have acquired a taxable situs therein, but where there is no break in the transit the property will not have acquired a taxable situs within the jurisdiction of a State taxing unit.

---

REFERENCES FOR POINTS IN HEADNOTES

[1, 6] 51 Am Jur, Taxation § 205.
Breaking continuity of passage or shipment as affecting its interstate character. 60 ALR 1465.
[2] 11 Am Jur, Commerce § 64 *et seq.*
[3] 51 Am Jur, Taxation § 202 *et seq.*
[4, 9–13] 51 Am Jur, Taxation § 215.
[5] 11 Am Jur, Commerce § 72.
[7] 43 Am Jur, Public Utilities and Services § 22.
[8] 24 Am Jur, Gas and Oil § 3.

4. GAS—AD VALOREM TAXATION BY STATE—INTERSTATE COMMERCE.

The fact that gas is not a solid or that it is continually in movement does not prevent it from being contained, controlled, stored, and dealt with as a commodity subject to ad valorem taxation by a State taxing unit, where it may have come to rest in the course of its passage in interstate commerce.

5. COMMERCE—INTERSTATE COMMERCE—STORAGE OF COMMODITY.

The mere fact that a commodity has gone into storage does not necessarily take it out of interstate commerce.

6. SAME—INTERSTATE COMMERCE—AD VALOREM TAXATION BY STATE—INTERRUPTION OF CONTINUITY OF TRANSIT.

Property in interstate commerce *would not be subject* to ad valorem taxation by a State taxing unit merely because of a break in transit due to a breakdown in the transportation system, a delay to promote the safe or convenient transit of the property, to await ships, or to permit accumulation of sufficient cargo to load a ship but *would be subject* to such a tax if the interruption is not in necessary delay or accommodation to the means of transportation but for the business purposes and profit of the taxpayer such as a halt to process the goods, to accumulate a stock of goods to enable the owner to fill orders more readily, to separate the goods for distribution to customers, to place the goods in different containers, or to hold them for sale.

7. GAS—PUBLIC UTILITY.

A public utility supplying gas is under an obligation to provide the needs of its customers and is not a free agent to sell or withhold the sale of its commodity within the territory it serves.

8. SAME—PERSONAL PROPERTY—STORAGE—PROCESSING—SALES.

Natural gas is personal property which can be stored, processed, and sold.

9. SAME — INVENTORY GAS — STORAGE — INTERSTATE COMMERCE — AD VALOREM TAXATION.

Inventory gas brought into the State through pipelines used in interstate commerce to storage fields owned by gas utility domestic corporation, dehydrated and injected into the storage field during periods of year when pipeline supply exceeds demand and, after reprocessing, withdrawn when demand exceeds pipeline supply *held*, subject to ad valorem taxation by a State taxing unit, since the gas came to rest when it was stored, its interstate journey being ended at that point.

10. SAME—BASE GAS—AD VALOREM TAXATION.

> Base gas which is injected into an underground field for the storage of dehydrated natural gas in order to keep out foreign material, including water, and to keep depleted gas fields as operating storage facilities, which base gas remains a constant from year to year although it may intermix with other gas in the field, and which base gas is accounted for as a capital asset is such an integral part of the storage facility as to be subject to an ad valorem tax by the State taxing unit in which the fields were located.

11. SAME—BASE GAS—SEVERANCE TAX—AD VALOREM TAX.

> Base gas which had been injected into an underground field for the storage of dehydrated natural gas in order to keep out foreign material, including water, and to keep depleted gas fields as operating storage facilities, upon which base gas a severance tax had been paid by others than defendant when severed, *held*, subject to ad valorem tax in State taxing units where located, the severance tax act which exempted only those who had paid the tax, especially where the gas utility owner of the storage fields failed to establish that the injected base gas was Michigan gas on tax day (CL 1948, § 205.301 *et seq.*).

12. SAME—AD VALOREM TAX—STORAGE FIELDS—INTERSTATE COMMERCE.

> Ad valorem tax by State taxing units on gas stored in underground storage fields in this State is not discriminatory, where all parties who use such facilities are also taxed, and all of plaintiff's gas as well as that of competitors which actually flows in interstate commerce is not subject to the ad valorem tax.

13. SAME—BASE GAS—AD VALOREM TAX—SEVERANCE TAX.

> An annual ad valorem tax imposed upon base gas, injected into underground storage field for dehydrated natural gas in order to keep out foreign material, including water, and to keep depleted gas fields as operating storage facilities, and upon which a severance tax was paid by others than present owner, *held*, not a discriminatory tax, notwithstanding other Michigan gas in place was not subject to ad valorem taxation prior to severance, since payment of the severance tax on a commodity subject thereto does not insulate the commodity from further taxes forever, where there is a physical serviceable continuity in its existence and not a consumption that eliminates it from use (CL 1948, § 205.301 *et seq.*).

Appeal from Mecosta; Van Domelen (Harold), J. Submitted February 7, 1964. (Calendar Nos. 64–66, Docket Nos. 50,364–50,366.) Decided June 1, 1964.

Three separate actions by Michigan Consolidated Gas Company, a Michigan corporation, against the townships of Austin, Millbrook, and Hinton, political subdivisions of the county of Mecosta, to recover taxes, levied on natural gas stored in underground gas field areas, and paid under protest. Frank J. Kelley, Attorney General, intervened as party defendant. Cases consolidated for trial and on appeal. Judgments for defendants. Plaintiff appeals. Affirmed.

*A. D. Ruegsegger, Cedric A. Richner, Jr.,* and *Barry L. King (Dyer, Meek, Ruegsegger & Bullard,* of counsel), for plaintiff.

*William A. Harper (William T. McElwain,* of counsel), for defendants.

*Frank J. Kelley,* Attorney General, *Robert A. Derengoski,* Solicitor General, *T. Carl Holbrook* and *William D. Dexter,* Assistant Attorneys General, for the intervenor-defendant.

Adams, J. Plaintiff instituted actions against the defendant townships for the recovery of ad valorem personal property taxes imposed on natural gas located in the townships on December 31, 1960. The taxes were paid under protest.* The chief ground of protest was that the tax is discriminatory and illegal because it is assessed upon natural gas which is in interstate commerce.

---

* See CL 1948, § 211.53 (Stat Ann 1960 Rev § 7.97).—Reporter.

The problem before the trial judge and before us on appeal is not to determine the applicable law —(there is no dispute as to the law)—but, rather, what the ultimate fact situation is from a considerable array of facts.   The law was recently stated by the United States supreme court in *Independent Warehouses, Inc.,* v. *Scheele* (1946), 331 US 70, 72, 73 (67 S Ct 1062, 91 L ed 1346):

"The governing principles were stated in *Minnesota* v. *Blasius,* 290 US 1, 9, 10 (54 S Ct 34, 78 L ed 131) as follows:   *   *   *

" 'The States may not tax property in transit in interstate commerce.   But, by reason of a break in the transit, the property may come to rest within a State and become subject to the power of the State to impose a nondiscriminatory property tax. Such an exertion of State power belongs to that class of cases in which, by virtue of the nature and importance of local concerns, the State may act until Congress, if it has paramount authority over the subject, substitutes its own regulations.   The "crucial question," in determining whether the State's taxing power may thus be exerted, is that of "continuity of transit."   *Carson Petroleum Co.,* v. *Vial,* 279 US 95, 101 (49 S Ct 292, 73 L ed 626).   *   *   *

" 'If the interstate movement has begun, it may be regarded as continuing, so as to maintain the immunity of the property from State taxation, despite temporary interruptions due to the necessities of the journey or for the purpose of safety and convenience in the course of the movement.   *   *   *   Formalities, such as the forms of billing, and mere changes in the method of transportation do not affect the continuity of the transit.   The question is always one of substance, and in each case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied.' "

Or appellees have stated the law as follows:

"The supreme court of the United States decisions clearly indicate that the power or jurisdiction of the State to tax turns upon whether or not the property constituting the subject of taxation *has come to rest* within the taxing jurisdiction *for local business purposes.* If it has, the authorities unanimously uphold the jurisdiction of the States to tax. On the other hand, if the property *is in transit in interstate commerce and there is no break in the transit, such property has not acquired a taxable situs* within the taxing jurisdiction for ad valorem property tax purposes." (Emphasis supplied.)

Now, as to the facts, plaintiff is a Michigan corporation engaged as a public utility in the production, purchase, transportation, storage, distribution, and sale of natural gas. These activities are carried on in 7 separate districts in Michigan. It operates as a gas utility in the cities of Detroit, Grand Rapids, Muskegon, Ann Arbor, Mount Pleasant, Greenville, Belding, Big Rapids, Ludington, Traverse City, Cadillac, and Sault Ste. Marie, and certain adjacent territory. It is the largest natural gas distributor in the State of Michigan with over 800,-000 customers and is engaged in the sale of natural gas to domestic, commercial, and industrial consumers in the above cities and approximately 160 additional municipalities.

Plaintiff's business does not include the transportation of any natural gas either into or outside of Michigan. It carries on all of its activities and all its property is located within the State. It is subject to regulation by the Michigan public service commission *except for its storage operations.*

During the summertime the pipeline supply exceeds the Detroit market. The surplus gas is transported northward to the Six Lakes field. During the wintertime the Detroit market exceeds the sup-

ply of pipeline gas and it is necessary that sufficient capacities be available from the Six Lakes field to supply the difference in the Detroit market. The winter market in Michigan is from 7 to 10 times that of the summer market. This situation was described by the plaintiff in a First Mortgage Bond Prospectus, dated May 23, 1961, reading in part as follows:

"The company owns a number of underground gas storage fields. * * * By storing gas in the summer for use during winter months, the company is able to deliver large volumes of gas in addition to the daily deliveries by its pipeline suppliers. As a consequence, maximum volumes of gas are made available for space heating and other firm uses which are the most remunerative and least affected by fluctuating economic conditions. * * * These storage fields also enable the company to purchase gas from its pipeline suppliers at the most favorable load factors, thus insuring the most advantageous rates."

It will be noted from the map* appended to this opinion that plaintiff's storage facilities are located in west central Michigan. Delivery of the gas is made to plaintiff in the Detroit area. The gas which is destined for storage is then transmitted through plaintiff's pipelines in a northwesterly direction from Detroit to the storage fields. There it is stored until such time as there is a demand for it. It is then withdrawn from the fields either to supply local markets in west central Michigan or to supply the primary Detroit market in which case the gas is returned through the pipelines to the Detroit area.

The storage of gas in these underground gas storage fields may be defined as the storage in reservoirs of porous rock at various depths beneath the

---

* Exhibit A, appellant's appendix.

surface of the earth of large quantities of natural gas not native to those reservoirs. The storage fields are self-contained and natural gas can be stored indefinitely in them at high pressures. They are physically separated from plaintiff's transmission lines by surface facilities—dehydrators, gathering lines, compressors, meters, et cetera—which are used to process the gas into the reservoir and to return it to the transmission lines.

Base gas was injected into the storage fields. The purpose of the base gas is to keep out foreign material, including water, and to keep depleted gas fields as operating storage facilities. The amount of

base gas remains a constant through the years ex-
cept for any change in the pressure base, but the
base gas intermixes with other gas in the field. Gas
which is stored in the storage fields as injected *base
gas* is accounted for as a *capital asset*. The addi-
tional gas which is injected into a storage field over
and above the base gas is known as *inventory,
current or working gas*. It is withdrawn from time
to time to meet the needs of plaintiff's customers.
The base gas could be withdrawn, but if it were
water would come into the fields, making them in-
efficient.

The pressures in the gas storage facilities are not
directly related to the pressures in the transmission
lines of the plaintiff or of plaintiff's suppliers. The
plaintiff purchased most of its gas from companies
operating in Kansas, Louisiana, Oklahoma, and
Texas. All severance and production taxes on the
gas coming into Michigan from those States were
paid in accordance with their laws. Interstate pipe-
lines deliver the gas to Michigan. There the pipe-
lines connect with plaintiff's system in which the im-
ported gas flows directly to local markets or to the
storage reservoirs. Gas that is injected into the
fields from time to time intermixes with the gas al-
ready in the fields. Since their use for storage,
huge quantities of natural gas have always been
stored in the fields in addition to the injected base
gas and native gas.

The reservoirs are commonly referred to as stor-
age fields and their operation is separated from and
accounted for by plaintiff as distinct and different
from the production, transmission, and distribu-
tion facilities of the plaintiff. The storage of the
natural gas commences when gas is delivered to the
field gathering system and ends when the gas en-
ters the transmission lines to take it to market.
Plaintiff's utilization of these reservoirs for storage

of gas is no different from the utilization of facilities for the storage of any other commodity except for the difference in the nature of the commodity.

The plaintiff's suppliers do not have sufficient pipeline capacity available to provide plaintiff with the gas required to meet cold weather space heating needs of plaintiff's customers, but have available a supply of gas in excess of plaintiff's customers' needs as their space heating requirements are minimized during warm weather. By the use of storage facilities, the plaintiff is able to store the excess pipeline supply and thereby utilize that excess to meet cold weather requirements of its customers.

Storage capacity somewhat in excess of annual pipeline supply is desirable to provide for unpredictable factors such as business conditions, strikes, and abnormal winters. The storage program also tends to insure an adequte supply of gas in case of disruption in service bringing the gas from the southwest.

The function of the gas storage field is to store the commodity which is sold by plaintiff until such time as the demands of its customers require its delivery to market.

As to the Austin field, plaintiff developed this field for storage purposes in 1941 after it became depleted as an operating field. Plaintiff injected into the field, during the years 1941 and 1942, 2,476,-935 Mcf of gas produced from the Lincoln, Freeman, and Reed City fields in Michigan. Either a predecessor company of appellant or an affiliate paid the severance taxes on this gas.

In 1948 plaintiff leased the Austin field to Michigan-Wisconsin Pipe Line Company. That company under its lease maintains the injected base gas in the field, which is the only gas of the Austin field involved in this case. Because of possible commingling it is not known what part, if any, of the base

gas originally injected into the Austin field in 1941–1942 was still in that field on December 31, 1960.

The Six Lakes field was converted from a producing to a storage field in March of 1953. It is a much larger field than Austin with a capacity 7 to 8 times greater.

It is plaintiff's contention that the whole high pressure network, including the storage system, is 1 vessel involved in interstate commerce. Plaintiff further contends that because it is a fully regulated utility whose rates and profits are determined by the Michigan public service commission it is unreasonable to say that it stores gas for "profit purposes." Plaintiff contends that the storage of gas is the only feasible method to supply the tremendous winter demands of its customers and, at the same time, provide comparative safety in the operation. Plaintiff's position is that the gas is stored for the purpose of convenience and safety in the course of movement to the ultimate consumer, and that such storage is necessarily incident to the method of transit.

Plaintiff cites *Standard Oil Co.* v. *Federal Trade Commission* (1951), 340 US 231 (71 S Ct 240, 95 L ed 239), in support of its position. This is an antitrust case in which, to determine Federal jurisdiction, the court said (pp 237, 238):

"Petitioner is an Indiana corporation, whose principal office is in Chicago. Its gasoline is obtained from fields in Kansas, Oklahoma, Texas and Wyoming. Its refining plant is at Whiting, Indiana. It distributes its products in 14 middle western States, including Michigan. The gasoline sold by it in the Detroit, Michigan, area, and involved in this case, is carried for petitioner by tankers on the Great Lakes from Indiana to petitioner's marine terminal at River Rouge, Michigan. Enough gasoline is accumulated there during each navigation season so that a winter's supply is available from

the terminal. The gasoline remains for varying periods at the terminal or in nearby bulk storage stations. * * * Gasoline delivered to customers in Detroit, upon individual orders for it, is taken from the gasoline at the terminal in interstate commerce en route for delivery in that area. *Such sales are well within the jurisdictional requirements of the act.* Any other conclusion would fall short of the recognized purpose of the Robinson-Patman act to reach the operations of large interstate businesses in competition with small local concerns. Such temporary storage of the gasoline as occurs within the Detroit area does not deprive the gasoline of its interstate character." (Emphasis added.)

Defendants counter with *Joy Oil Co., Ltd.,* v. *State Tax Commission,* 337 US 286 (69 S Ct 1075, 93 L ed 1366), a case under the export provisions of the Constitution of the United States, art 1, § 10, clause 2, rather than the commerce clause (US Const, art 1, § 8, clause 3). The case involved a 1,500,000-gallon shipment of gasoline from Grand Rapids to Detroit for export to Canada. The gasoline, produced in Michigan, was placed in storage in Dearborn, Michigan. The Ambassador Bridge was closed to shipment of gasoline after only 50,000 gallons had been exported, and consequently the gasoline remained in storage for about 18 months before it was finally exported. In the meantime, the city of Dearborn assessed a property tax on the gasoline. The opinion of the court, delivered by Mr. Justice Frankfurter, states (p 288):

"But here the period of storage at Dearborn was so long as to preclude holding that the first step toward exportation would inevitably be followed by others. * * * While in storage, the gasoline might have been diverted to domestic markets without disruption of any existing arrangement for its transshipment and without even breach of any con-

tractural commitment to a foreign purchaser. Neither the character of the property nor any event equivalent to its redelivery to a common carrier made export certain for all practical purposes."

Neither *Standard Oil Co.* v. *Federal Trade Commission, supra,* nor *Joy Oil Co., Ltd.,* v. *State Tax Commission, supra,* involves the question of the power of a State to levy an ad valorem tax. However the cases are helpful in determining what constitutes interstate commerce. From them and the facts in this case, it is clear that plaintiff's gas was in interstate commerce from the time it entered its lines from the supplier's pipelines until it was directly transmitted to and consumed by the ultimate user or was placed in storage. On the other hand, there can be no question but that much of the gas actually is stored. The fact that gas is not a solid or that it is continually in movement does not prevent it from being contained, controlled, stored, and dealt with as a commodity. The gas is processed into storage, moisture being removed for that purpose, and it is processed out of storage. Of the 366 days of the year 1960 there were only 12 days in which gas was both injected into and withdrawn from the Six Lakes storage field. As to the Austin field, from January 24 to February 18, 1960, inclusive, gas was neither withdrawn from nor injected into the field. From May 24 to July 5, inclusive, and from July 22 to August 6, inclusive, gas was neither injected into nor withdrawn from the field. Between October 8 and December 31, with the exception of 15 days, gas was neither withdrawn nor injected into the field.

The mere fact that a commodity has gone into storage does not necessarily take it out of interstate commerce. The problem was analyzed this way by the supreme court of California in *Von Hamm-*

*Young Co., Ltd.,* v. *San Francisco,* 29 Cal 2d 798, 802, 803 (178 P2d 745, 171 ALR 274):

"The basic issue with respect to the taxability of the goods that were shipped by rail to San Francisco is whether their storage in San Francisco constituted such a break in their interstate transit as to remove them from the protection of the commerce clause. * * * 'The "crucial question" in determining whether the State's taxing power may thus be exerted is that of "continuity of transit." *Carson Petroleum Co.* v. *Vial,* 279 US 95, 101 [49 S Ct 292, 73 L ed 626] * * * The question is always one of of substance and in any particular case it is necessary to consider the particular occasion or purpose of the interruption during which the tax is sought to be levied.' [quoting from *Minnesota* v. *Blasius, supra.*]

"The question therefore is what occasion or purpose will bring the property within the jurisdiction of the local taxing authority. If the break in interstate transit is merely incident to the interstate journey, such as a breakdown in the transportation system (*Champlain Realty Co.* v. *Town of Brattleboro,* 260 US 366 [43 S Ct 146, 67 L ed 309, 25 ALR 1195]), or a delay to promote the safe or convenient transit of the property (*Champlain Realty Co.* v. *Town of Brattleboro, supra; Kelley* v. *Rhoads,* 188 US 1 [23 S Ct 259, 47 L ed 359]), to await ships, or to permit accumulation of sufficient cargo to load a ship (*Carson Petroleum Co.* v. *Vial,* 279 US 95 [49 S Ct 292, 73 L ed 626]), the property remains immune from local taxation. A property tax may be imposed on the cargo, however, if the interruption is 'not in necessary delay or accommodation to the means of transportation * * * but for the business purposes and profit of the [taxpayer]' (*General Oil Co.* v. *Crain,* 209 US 211, 230, 231 [28 S Ct 475, 52 L ed 754]; *Susquehanna Coal Co.* v. *South Amboy,* 228 US 665, 668 [33 S Ct 712, 57 L ed 1015]), such as a halt to process the goods (*Bacon* v. *Illinois,*

227 US 504 [33 S Ct 299, 57 L ed 615]; *Missouri Pacific R. Co.* v. *Schnipper* [CCA 7], 56 F2d 30), to accumulate a stock of goods to enable the owner to fill orders more readily (*Susquehanna Coal Co.* v. *South Amboy, supra*), to separate the goods for distribution to customers, to place the goods in different containers (*General Oil Co.* v. *Crain, supra*) or to hold the goods for sale. (*Minnesota* v. *Blasius,* 290 US 1 [54 S Ct 34, 78 L ed 131]; *American Steel & Wire Co.* v. *Speed,* 192 US 500 [24 S Ct 365, 48 L ed 538]; *Brown* v. *Houston,* 114 US 622 [5 S Ct 1091, 29 L ed 257].)"

The question is whether the gas, once it has gone into storage, has completed its interstate journey and is subject to such ultimate disposition as plaintiff may elect to make of it, or whether, because plaintiff is a public utility bound to serve the requirements of its customers and is not a completely free agent in the final disposition of the gas, it is, in effect, at all times earmarked for delivery to plaintiff's 800,000 customers and has not completed its interstate journey but has merely come temporarily to rest.

The cases from other States are small help. The question was considered by the Illinois supreme court in *Mississippi River Fuel Corporation* v. *Hoffman* (1954), 4 Ill 2d 468 (123 NE2d 503), certiorari denied 349 US 935 (75 S Ct 785, 99 L ed 1264); and *Wilcox* v. *Illinois Commerce Commission* (1962), 23 Ill 2d 432 (178 NE2d 873). In the *Wilcox Case* the Illinois court said (p 437):

"Gas storage fields are no novelties. They exist in more than a dozen States and were 'well known' in 1955 when this court delivered its opinion in *Mississippi River Fuel Corp.* v. *Hoffman,* 4 Ill 2d 468 (123 NE2d 503). Likewise, the public benefit of gas storage fields is also well known. Storing gas in the area of the ultimate market during the warm summer months when the supply of gas from the

fields of the south and southwest via the pipelines is plentiful, for use during the winter when peak requirements are needed, enables more of the public to be furnished natural gas than otherwise would be possible. It is also evident that gas storage enables the gas companies to store the gas for more beneficial uses than to be forced to 'dump' the gas in the summer time."

The gas was considered to be in interstate commerce.

To the contrary, the Pennsylvania supreme court in *Emerald Coal & Coke Co.* v. *Equitable Gas Co.,* 378 Pa 591 (107 A2d 734), held that interstate transmission of natural gas ceases when the gas reaches underground storage facilities for storage and subsequent local distribution, saying (p 595):

"Admitting that the gas which is stored in the Pratt Pool was transported in interstate commerce, we must yet hold that once it has reached these facilities for storage it has come to rest and is then subject to local regulation. It is not stored solely as a step in further interstate transportation or sale, but is thereafter transported and sold in *areas of this Commonwealth,* when demands call for its use. The cases cited by the defendant to sustain its contention that this activity is interstate are not in point, for in those cases the facilities were solely temporary interruptions in the interstate commerce of the product. Here the storage is an essentially local aspect of its business."

The question involved in this case, however, was not the right of the State to tax but whether the Pennsylvania equity court had jurisdiction to act where storage of gas might endanger the safety of a coal mine operation located in a strata above that where it was planned to store the gas.

Plaintiff, as a public utility, is under an obligation to provide the needs of its customers. Part of

those needs is met by gas flowing directly in interstate commerce. The balance is met from the gas which has been placed in storage for this specific purpose. The record is clear that no other method would be as efficient and inexpensive as the one used to meet customer needs. Approximately 56% of all gas delivered came from storage on the peak day of the winter of 1961–1962. If additional or greater capacity pipelines were built to meet winter demand they would operate at only a fraction of capacity during summer, an inefficient and uneconomical result. Plaintiff is not a free agent. It is not at liberty to sell or withhold the sale of gas at its option. It is not engaged in the free marketing of a commodity. Within the various territories which it serves it is under obligation to furnish the needs of its customers.

The usual situation of storage in interstate commerce involves the accumulation of cargo of sufficient quantity to make up a shipment. The situation here is somewhat analogous. If the interstate pipelines had a sufficient capacity to supply all of the needs of plaintiff's customers, the gas would move in an unquestioned flow from the well-head to the customer. However, because of lack of capacity of the pipelines the flow is evened-out by accumulation of gas in the storage fields when there is an excess and by drawing upon the storage fields when the pipeline supply is inadequate. Thus the fields are equalizing instruments in the interstate movement of plaintiff's gas.

On these facts plaintiff's inventory gas is certainly more definitely earmarked for the ultimate consumer than in the case of *Standard Oil Co.* v. *Federal Trade Commission, supra.* If that decision of the United States supreme court was applicable here, we would have no difficulty in holding that the storage is temporary and does not deprive the gas

of its interstate character. However, as previously noted, in that case the supreme court was considering a Federal jurisdictional question under the Robinson-Patman act.

We, on the other hand, are concerned with a question of State power to tax. In our opinion, the cases most closely in point are *Independent Warehouses, Inc.,* v. *Scheele, supra,* and *Susquehanna Coal Co.* v. *South Amboy,* 228 US 665 (33 S Ct 712, 57 L ed 1015).

In the *Susquehanna Coal Case* the plaintiff was a dealer shipping coal from Pennsylvania to New York via New Jersey. A small amount of the coal was unloaded at South Amboy, New Jersey, and used to fill anticipated orders from plaintiff's customers. Without such accumulations there might be a period where there were no cars and no coal to fill orders, causing customers to suffer. The coal remained in storage in a coal yard until plaintiff's agents requisitioned it. Then it was loaded on bottoms and delivered to the consignee in New York or some other State. The supreme court said (p 668):

"The conclusion of the district court was that by the storage of coal, plaintiff in error 'obtained 2 beneficial results. First, cars arriving when no bottoms were on hand could be released and demurrage charges saved; second, when the bottoms arrived and no cars were on hand containing the kinds of coal desired, such vessels could be loaded from the piles, resulting in a saving of time in the departure of such bottoms.' In other words *there was something more than the submission to delay in transportation and the acceptance of its consequences. The situation was made a facility of business,* a business conducted through agents and employees. And, it will be observed, there was valuable property kept in the State represented by the coal, varying in quantity from 10,000 tons to 150,000 tons. There

was something more, therefore, than an incidental interruption of the continuity of its journey through the State." (Emphasis added.)

The Court went on to say (p 669):

"The coal, therefore, was not in actual movement through the State; it was at rest in the State, and was to be handled and distributed from there",

citing in support *General Oil Co.* v. *Crain,* 209 US 211 (28 S Ct 475, 52 L ed 754), and *Bacon* v. *Illinois,* 227 US 504 (33 S Ct 299, 57 L ed 615), an oil case and a grain case in both of which the power of the State to tax was upheld.

In *Independent Warehouses, Inc.,* v. *Scheele,* 331 US 70 (67 S Ct 1062, 91 L ed 1346), an annual license tax for the privilege of carrying on the business of storing out-State coal, pending a decision by the owner whether to ship it on to another State or to another point in the same State, was upheld even though most of the coal was shipped to other States. Many of the arguments which are made in this case were made in that case in favor of holding that the coal was in interstate commerce. It was pointed out that coal is a commodity of seasonal consumption, that the storage permitted greater uniformity of shipment througout the year, more efficient shipment during warm weather for consumption in winter months, prevented acute shortages of fuel in case of labor, weather, or other interruptions in production or transportation, and prevented a much more expensive method of shipment if coal had to be shipped in winter weather. The court said (p 81):

"Once the coal has reached Coalberg, no one. can determine, without receiving an · order from the owner, to what point or person it finally will be. sent or to what use it will be put. Indeed, at the actual time of storage, even the owner may not know where

the coal will go next, for the very purpose of the storage is in part to meet seasonal demand."

Significantly, the Court said (p 84):

"*Moreover, as has been noted, some of the coal remains in New Jersey, being shipped out from Coalberg as the shipper directs. As to this all interstate transportation has ended.*" (Emphasis added.)

In a dissent by Justice Jackson, objection was made to the imposition of the tax because (pp 94, 95):

"The ultimate burden of the tax falls on consumers of New York and elsewhere who have no representation in the government which lays the tax and fixes its amount. The authorities who fix the tax will never have to answer to those who pay it. That is the evil of 'taxation without representation.' Here is a tax that falls immediately upon a single taxpayer, for it does not appear that any other is similarly affected."

The objection raised, it might be pointed out, does not apply to the present case.

The only possible distinction between the above cases and the present one is that in *Susquehanna* and *Independent Warehouses, supra,* the commodity involved was coal, and in *Bacon* and *General Oil, supra,* grain and oil, whereas in this case the commodity is natural gas. While the physical properties of gas are admittedly different, as we have previously noted, gas is personal property which can be stored, processed, and sold. The reasons for storage cannot be distinguished in the above cases—convenience, economy, efficiency, better service to customers. The disposition of the gas after storage is also much the same—to customers of the supplier upon demand, eventuating because of weather conditions, the state of the economy, successful business operations and so on. We con-

clude, therefore, as to the ultimate fact, that the gas came to rest within the State of Michigan when it was stored and that its interstate journey ended at that point. The tax was properly imposed.

The base gas presents little question. It is as much an integral part of the storage field facility as the compressors, heaters, scrubbers, after-coolers, measuring, regulating and dehydrating equipment, which are needed for the purpose of placing the gas into storage and removing it from storage. The fields could not operate without the base gas which is a constant factor as to amount even though the gas itself may change due to intermixing with the inventory gas that is pumped into and out of the fields.

Plaintiff during 1941 and 1942 originally injected the base gas into the Austin field from gas produced from other Michigan fields. Severance taxes were paid on this gas, and it is, therefore, the plaintiff's claim that under the provisions of the Michigan severance tax act (CL 1948, § 205.301 *et seq.* [Stat Ann 1960 Rev § 7.351 *et seq.*]) the base gas is exempt from taxation. Plaintiff did not pay the Michigan severance tax. There is a serious question as to whether it would be entitled to the exemption even if it had established the fact that the base gas on December 31, 1960, was Michigan gas.

The Michigan severance tax act is entitled:

"An act levying a specific tax to be known as the severance tax upon all corporations, associations or persons engaged in the business of severing oil and gas from the soil; and prescribing the method of collecting the license; requiring all those engaged in the severance of such products to make reports of their business; to provide penalties and to prescribe for the disposition of the funds so collected; *and to exempt those paying such specific tax from certain other taxes.*" (Emphasis added.)

The title specifically deals with the scope of the exemption to be granted in the body of the act and, consequently, the exemption would be so limited. In any event, since the plaintiff, upon whom the burden of proof lay, failed to establish that the injected base gas was Michigan gas on tax day, the same was properly taxed.

Plaintiff's final contention that an ad valorem property tax on the natural gas stored in its underground storage reservoirs unconstitutionally discriminates because a similar tax has not been paid by plaintiff's "competitors" whose product is flowing in interstate commerce is without merit. The basis of classification is reasonable. Any of plaintiff's competitors who elect to use a similar facility for the storage of gas will be likewise subject to tax. The gas of plaintiff and of plaintiff's competitors which is actually flowing in interstate commerce is not subject to tax.

As to the claim of discrimination in favor of Michigan gas, exempt except for the severance tax, and plaintiff's base gas, as opposed to an annual ad valorem tax, the classification used in taxing Michigan gas *in place* also would appear to be a valid one. All of such gas is similarly treated. The situation is much the same as the freedom from tax, in some cases, of timber until it is severed and a severance tax paid. The payment of the severance tax does not insulate the timber from further taxes forever— *i.e.*, after it has become boards, lumber, or a house. The same situation applies here. There is no discrimination.

Affirmed. Costs to appellees.

Kavanagh, C. J., and Dethmers, Kelly, Black, Smith, and O'Hara, JJ., concurred.

Souris, J., did not sit.