Northern Illinois Gas Company, a Corporation, Petitioner-Appellee, v. Johannah H. Wienrank, et al., Donald R. Wienrank as Executor of the Estate of Christ J. Wienrank, Deceased, Defendants-Appellants.

Gen. No. 65–25.

Third District.

December 22, 1965.

Rehearing denied February 3, 1966.

John Alan Appleman, of Urbana, and Robert D. Mc-Knelly, of Watseka, for appellants.

Isham, Lincoln & Beale, of Chicago, and Gray, McIntire & Petersen, of Kankakee (Justin A. Stanley, Dean A. Esling, Robert A. Helman, David L. Lange and Donald Gray, of counsel), for appellee.

ALLOY, P. J.

This cause, which involves the condemnation of underground strata for gas storage purposes, was originally appealed to the Supreme Court of the State of Illinois. The Supreme Court, on March 10, 1965, caused this action to be transferred to this court and, in so doing, observed that it was argued that the ruling excluding evidence of special value of the land for gas storage purposes deprived the landowners of due process of law and also violated the constitutional provision that private property shall not be taken for public use without just compensation. The court stated that substantially the same issues were involved in Midwestern Gas Transmission Co. v. Mason, 31 Ill2d 340, 201 NE2d 379, and Peoples Gas Light & Coke Co. v. Buckles, 24 Ill2d 520, 182 NE2d 169. In view of the decisions in such cases, the Supreme Court concluded that the constitutional issues are no longer fairly debatable, and transferred the cause to this court for determination.

The cause originated in four cases brought by Petitioner Northern Illinois Gas Company which were consolidated for trial. Actions were instituted under the

Illinois Eminent Domain Act (Ill Rev Stats 1963, c 47, § 1, et seq.). As a result of such proceeding, Defendants were awarded a total of $27,503.35 as just compensation for the taking by Petitioner Northern Illinois Gas Company of certain subsurface easements in 366.7 acres for underground gas storage at a site near Crescent City in Iroquois County, Illinois. A change of venue had been granted from Iroquois County Circuit Court to Kankakee County Circuit Court on ground of alleged prejudice of the Presiding Judge. The cause was tried before a jury and extended over a period of nearly two weeks in November of 1963. Judgment orders were based on the jury's verdicts.

On appeal in this court, Defendants assert that since the petition condemned a "permanent, assignable easement" in all strata from 590 feet below the surface to the bottom of the St. Peter sandstone (an easement acquisition of approximately 800 feet in depth) that such easement is a freehold, i. e. an interest in land to which the test is the value of the freehold taken plus the amount of damage to the remaining property. It is contended that the Trial Court erred in using improper standards or tests for the measurement of such value. It is also contended that the Trial Court erred in receiving testimony of Petitioner's experts and excluding testimony of defense experts based on the following considerations:

1. That the testimony was restricted to a "single use" test, rejecting the test of concurrent consistent uses as comprising value.
2. That such testimony was restricted to a "single bidder" rule, rejecting testimony as to the existence of a competitive market and known values in that market.
3. All testimony of owners, it is contended, was rejected where based upon (a) adaptability of the land to irrigation (b) value under conditions of

irrigation (c) destruction of such potential as a result of gas storage (d) diminution of market value from reasonable fears of gas escaping with subsequent damage to wells and property, and (e) capacity of the land to be used separately or in combination for storage purposes under newly discovered procedures.

It is contended basically that the exclusion of all such testimony, and adherence to the procedures followed in the case constituted reversible error.

There is also a contention that the Trial Court impeded discovery procedures by denying access to pump test data although Petitioner's witnesses testified to these at time of trial and defense witnesses were cross-examined as to their ignorance of such data. It is likewise contended that the court took part in the trial by interrogation of witnesses and making of audible comments before the jury to such an extent that motions for mistrial should have been granted.

Petitioner was originally authorized to institute the condemnation action by an order entered by the Illinois Commerce Commission on April 18, 1962, which approved the preliminary development by Petitioner of an underground gas storage project near Crescent City. Some of the Defendants had intervened and participated in the proceedings before the Illinois Commerce Commission in opposition to the proposal by Petitioner to develop the project. An appeal was taken from the order of the Commerce Commission but was affirmed by the Circuit Court of Kankakee County and by the Appellate Court in Canady v. Northern Illinois Gas Co., 43 Ill App2d 112, 193 NE2d 48. Petition for leave to appeal was denied in the Supreme Court (in 28 Ill2d 625).

The petitioning utility is engaged in the business of distributing and selling natural gas to more than 800,000 customers in the northern part of Illinois, and is a public

utility regulated by the Illinois Commerce Commission under the Illinois Public Utilities Act. The development of the Crescent City Field which was approved by the Illinois Commerce Commission is designed to allow Petitioner to store large volumes of natural gas in a geological structure approximately 1,200 feet below the surface of the land, and will aid Petitioner in meeting the rapidly expanding needs of the public for natural gas in the service territory. The land involved in the Petitioner's preliminary development of the project has a total area of about 5,300 acres. The parcels involved in the case before us total an area 366.7 acres. The largest of the parcels is 120 acres in area and the largest contiguous area of any combination of the parcels is 160 acres with the smallest consisting of an area of 2 acres.

Gas storage in the field will take place in what is known as the St. Peter sandstone formation which in its natural state is saturated with water but which in the operation of the storage facility will have gas injected from the surface into the sandstone under pressure which pushes out and takes the place of some of the water in the pores of the sandstone. This is known as the aquifer-type gas storage project. No wells or other surface facilities of Petitioner will be located on the parcels of land involved in the case but the gas will enter the St. Peter sandstone under these parcels of land laterally after being injected through wells located on other parcels. Immediately above the St. Peter sandstone in the field are about 400 feet of alternating layers of limestone and dolomite and above that is a formation known as the Maquoketa formation which begins about 800 feet below the land surface and extends upward for about 200 feet to within 590 feet of the land surface. This formation consists of a lower dense shale member, a middle limestone member, and an upper dense shale member. Above this formation is the Silurian formation which is about 400 feet thick and immediately above that is glacial drift

which is about 200 feet thick. It is contemplated and found in the order entered by the Illinois Commerce Commission that the injected gas would not rise into or through the Maquoketa formation and that it would be confined to the geological strata lying more than 590 feet below the land surface at the Crescent City Field.

In the condemnation petitions Petitioner sought and obtained under certain judgment orders, underground gas storage easements in the parcels of land involved in the case covering a portion of the subsurface which starts at a depth of 590 feet or more below the land surface and goes down through the bottom of the St. Peter sandstone formation. In the petitions to condemn Petitioner undertook to conduct its operations in such manner as will permit the owner or owners of the land or other persons claiming an interest therein for minerals thereunder to explore for, drill, recover oil or gas under the land, or drill wells on the land for development of the production of water or disposition of salt water, fresh water or waste material from any of the formations other than those between the bottom of the St. Peter sandstone formation and the top of the Maquoketa formation in such manner as will not impair the efficiency or safety of Petitioner's operations.

The source of water in the Crescent City Field is in the glacial drift and Silurian formations, so that the water sources are above and would be protected by the Maquoketa formation since the deepest well on parcels of the land in question is about 130 feet deep and no farm water wells in the area go below the Silurian formation. The water in the area is of good quality and sufficient for the needs of the area. The lands are used for grain farming with the addition of livestock raising. None of the parcels has ever been irrigated but the farms had good crop yields in 1962.

The Illinois Commerce Commission order found that the Maquoketa formation at Crescent City Field would form an impermeable caprock or barrier to prevent the

68

■■■■■■■■■■■■■■■

vertical migration of any injected gas which might reach it. An independent consultant to Petitioner testified that in his opinion the Maquoketa formation would form an impermeable cap at the Crescent City Field and also that the project had been tested more extensively than any project he knows of in the United States or in Europe. This consultant is a professor at the University of California who is obviously well qualified in the field. Three valuation witnesses presented by Petitioner each testified that the impressment and use to fullest extent of underground gas storage easements sought by Petitioner would in no way impair the use of each of the parcels for farming and residential purposes. They also testified that the highest and best use of each of the parcels of land on the respective dates when the petitions to condemn were filed, was for farming and residential use. Each of Defendants' three valuation witnesses also testified that the parcels of land were used for farming and residential purposes on such dates and that without considering Defendants' offer of proof concerning possible use for underground gas storage, the highest and best use of the lands was for farming and residential purposes. Petitioner's valuation witnesses testified that the fair cash market value of each of the parcels for such use after the underground gas storage easement is impressed to its fullest extent on the parcels would be diminished by $25 per acre as compared to the value of the parcel for such highest and best use as of the date of the petitions for condemnation. Each witness also testified that in his opinion there would be no damage to the remainder of the land not taken as a result of the impressment of the easement. One of Defendants' witnesses testified that the diminution in value on the same basis would be $125 per acre; another witness, that the diminution in value would be $250 per acre; and the third, that the diminution in value would be $275 per acre.

The jury viewed the surface of the parcels of land involved in the case and found that the fair cash market

value of each of the parcels of land for its highest and best use as defined, that is, for agricultural and residential purposes, on the date of the condemnation petition would be diminished at the rate of $75 per acre by impressment on the parcel of the underground storage easement utilized to its fullest extent.

Defense objections, which were overruled, to the testimony of Petitioner's valuation experts were on the grounds (1) that a perpetual easement constitutes a freehold and that as such it must be valued separately (2) that the witnesses limited their testimony to a single use instead of the concurrent consistent uses to which the property was readily adaptable (3) that the opinions did not take into consideration a market value for the aquifer based upon competition therefor (4) that the witnesses were not qualified to express such opinion and (5) that no consideration was given to whether the land could be irrigated or the potentiality of gas escape or effect on value.

The primary question for consideration in this cause is whether or not the refusal of the Trial Court to admit evidence proffered by Defendants of the value of the parcels of land for underground gas storage was a proper ruling and consistent with the precedents in this State. The Trial Court refused to admit the evidence on the ground that it involved matters too remote and speculative to be relevant in the case and, in the process, relied upon the decisions of the Illinois Supreme Court in Peoples Gas Light & Coke Co. v. Buckles, 24 Ill2d 520, 182 NE2d 169, and Midwestern Gas Transmission Co. v. Mason, 31 Ill2d 340, 201 NE2d 379. In both the Buckles and Mason cases, the utility company had received from the Illinois Commerce Commission under the Illinois Gas Storage Act authorization to bring the condemnation proceedings to obtain an easement for underground gas storage. In each of the cases, the landowner received as just compensation the fair cash market value of the parcel of land in question for its highest and best use on

70

the date the petition for condemnation was filed, less the fair cash market value, on the same basis, after the parcel had been impressed to the fullest extent with the gas easement being taken. In each of these cases, the Supreme Court approved the rejection of evidence offered by the landowner of the value of the parcel for underground gas storage upon the ground that such proffered evidence was too remote and speculative.

An attempt is made to distinguish the present case on the facts from Buckles and Mason. For example, it is contended that the gas company in the Buckles case sought an underground gas storage easement in only a single geological formation, the St. Peter sandstone, while in the present case, the Petitioner seeks an underground gas storage easement in several geological formations ranging upward to the Maquoketa formation. We see no substance to this argument particularly in view of the fact that in the Mason case the utility company did, as here, seek underground gas storage easements in several subsurface formations.

It is also contended that the underground gas storage easements which Petitioner seeks herein are somehow different from underground gas storage easements which the gas company sought in the Buckles and Mason cases in that the Petitioners here are seeking a "permanent assignable easement" as opposed to what Defendants contend were limited easements taken in the Buckles and Mason cases. In the Buckles case, the gas company sought and obtained an "exclusive easement" for underground gas storage. In the Mason case, the gas company obtained a "permanent exclusive easement" for the same purpose. In the case before us, Petitioner sought and obtained an "exclusive easement" which easement is by its terms "perpetual and assignable by Petitioner to other authorized public utilities." We see no basic or fundamental difference in the easements sought in each of the three cases. They were easements for public utility facilities and assignable to other public

71

utility corporations. It is further contended that while the takings in the Buckles and Mason cases were of limited easements, that in the present the easement was of a higher quality, a freehold, and, therefore, that a different measure of compensation must be applied. The Supreme Court of this State has stated in Peoples Gas Light & Coke Co. v. Buckles, 24 Ill2d 520, at 532, 533, 182 NE2d 169, "No taking of the fee or damage to the surface of land is involved. Plaintiff's taking amounts to no more than an easement, and the usual measure of damages payable to such cases is based upon diminution of the fair cash market value of the property burdened by the easement." This recital specifically answers the contention made by Defendants herein referred to and the conclusion would be applicable in this case.

██ It is also reasoned that in the Buckles and Mason cases the Court found that there was no competent evidence that the geological formations in which the gas was to be stored had any value, while in the present case Defendants offered evidence as to the value for underground gas storage of such subsurface formations. This analysis is contrary to the conclusion in both the Buckles and Mason cases where the court concluded that evidence of the value of small parcels of land for underground gas storage was too remote and speculative to be admitted or considered. In the scholarly brief presented by Defendants it is suggested that this court overrule the Buckles and Mason decisions at least as applied to the state of facts before us in the instant case. An examination of such cases and the facts and circumstances in the present case furnishes, we believe, no reasonable basis for overruling or distinguishing the principles announced in both the Buckles and Mason cases and we, therefore, believe that the Trial Court properly determined that evidence of the value of the parcels for underground gas storage was too remote and speculative to be admissible, particularly in view of the fact that there was no basis in the evidence to show that there was a reasonable possibility that the

72

small parcels could be used as individual underground gas storage projects.

We also feel that the refusal of the Trial Court to admit Defendants' tendered evidence relating to the adverse effect of the possible gas leakage was proper under the record before us. The Commerce Commission proceeding in its order which authorized Petitioner to bring present condemnation proceedings culminated in a finding that the Maquoketa formation would provide an impermeable caprock for the project, and that order was affirmed specifically in Canady v. Northern Illinois Gas Co., 43 Ill App2d 112, 193 NE2d 48. In the Canady case, the Appellate Court was considering the propriety of the Illinois Commerce Commission order as reviewed under the Gas Storage Act (Ill Rev Stats 1961, c 104, §§ 104–112) and determined that the order of the Commerce Commission approving the project was not contrary to the manifest weight of the evidence in the finding that there would be no adverse effect on water resources. As we view the record in this case, there was no attempt to undertake a collateral attack on the Commerce Commission order, which would not have been sanctioned (Peoples Gas Light & Coke Co. v. Buckles, supra; Chicago North Shore & M. R. Co. v. Chicago, 331 Ill 360, 163 NE 141). The Trial Court in this cause actually heard evidence on the issue of whether or not there was a reasonable possibility that the injected gas would migrate above the Maquoketa and, on the basis of the record, concluded that the substantial weight of the evidence supported a conclusion that there was no reasonable possibility of such gas leakage above the Maquoketa. We believe the record sustains that conclusion. One of the Defendants' two technical witnesses expressed no opinion on the likelihood of gas leakage above the Maquoketa. The other witness who did assert that it would not be an impermeable caprock stated that he had not examined the cores taken from the Maquoketa in the Crescent City Field and admitted that he had previously

73

testified in the Commerce Commission proceeding to the effect that he would not expect the gas to get through that shale to the surface as he felt it was a good tight rock. Evidence concerning other unrelated gas storage projects, where no degree of similarity is shown, would not have been proper. It was indicated by the expert witnesses that each of the storage projects must be studied on its own merits and that caprock properties are not necessarily uniform from one aquifer project to another.

██ ██ The attempt to offer evidence of other unrelated gas storage projects, namely Herscher and Mohamet, to show a reasonable possibility that there would be gas leakage above the Maquoketa failed, under the record, to show a reasonable similarity between the gas storage project under consideration and the other projects referred to. The Trial Court's conclusion, on the record, that there is no reasonable possibility that gas injected into the Cresent City Field would migrate vertically above the Maquoketa formation, likewise justified the court's refusal to allow testimony as to adverse effect or danger of fire and destruction of water resources in the glacial drift and Silurian formations of possible gas leakage above the Maquoketa formation. Before consideration of an element of danger and diminution in value there must be a substantial danger or reasonable possibility of a direct disturbance of a property right (Central Illinois Light Co. v. Nierstheimer, 26 Ill2d 136, 185 NE2d 841; Illinois Power & Light Corp. v. Talbott, 321 Ill 538, 152 NE 486). In both of the cases referred to, the Supreme Court held that fear of danger and fire may not be considered as elements of damage or in diminution of value in cases involving condemnations of easements for overhead power lines. Under the record in this case we believe the same principle would apply here.

██ It is apparent from the record that present water resources in the glacial drift and Silurian formations would not be affected by the underground gas storage

and there was no showing of a reasonable possibility that the user would have cause to go below the glacial drift and Silurian for water supplies. To the extent that there might be any loss of water in the St. Peter formation and other strata covered by the gas storage easement, the jury heard the valuation witnesses testify with respect to the effect on water in such formations and apparently considered it in arriving at the award. Similarly, the contentions made with respect to possible irrigation of the farms does not make the awards inadequate on the record before us. The evidence indicated that present water resources, which would not be affected by the underground gas storage, would be sufficient to support irrigation of the farms if such irrigation were undertaken.

Action of the Trial Court in sustaining objections to an opinion from a witness tendered by Defendants was proper, since the Trial Court has a broad discretion in determining whether or not a witness has been qualified as an expert in a manner which would allow him to present opinion evidence (County of Cook v. Holland, 3 Ill2d 36, 119 NE2d 760). The witness had testified that he was a vegetable and grain farmer and irrigates his farm and there was no evidence as to the similarity of the particular land to farms which the witness had seen which might have been irrigated or to his own farm nor was he an expert on irrigation in any respect. Similarly, another witness who was asked his opinion as to the adequacy of the glacial drift water supply to support irrigation, had indicated that he had made no specific studies of ground water reserves in the county. It is obvious that the court did not abuse its discretion in refusing such testimony. The fact that a witness actually testified as to some related matters on behalf of Petitioner (but who was qualified as a geologist and hydrologist and who was also familiar with the water resources in the area, having studied these matters) furnished no substantial basis to reverse the ruling of the

75

Trial Court as to witnesses referred to which it deemed nonqualified.

It is also contended by Defendants that the Trial Court in making rulings on the evidence, by implication criticized or rebuked counsel for Defendants in a manner which prejudiced Defendants in the eyes of the jury and also that Defendants were prejudiced when the Trial Court questioned certain witnesses and thereafter made rulings. While the record discloses that the Trial Court sustained Petitioner's objections to Defendants' evidence and offers of evidence, such rulings were consistent with the precedents referred to in the course of this opinion. As stated in Department Of Public Works & Buildings v. Diggins, 374 Ill 11, at page 16, 27 NE2d 826, while remarks of a court made to or in the presence of the jury and having the force of an instruction or opinion on the evidence may be ground for reversal, the Trial Court may properly give its reasons for ruling upon the evidence and it should be accorded reasonable latitude in so doing. As indicated in that case, not every unguarded expression of the Judge stating his reason for his ruling can or should be treated as a ground for granting a new trial unless prejudicial error is clearly shown. The court undertook to question certain witnesses. As the record shows, this was largely done prior to ruling on motions as to their testimony and obviously for the purpose of being clear as to the testimony before ruling on the motion. Such occasional questioning by a Trial Court in absence of a manifest abuse of such procedure would not constitute reversible error (People v. Filas, 369 Ill 51, at 55, 15 NE2d 496).

On a review of the record and considering the testimony of the valuation witnesses, the verdicts of the jury awarding Defendants $75 per acre was consistent with the range of the testimony as actually presented. Where the court sustained objections to Defendants' interrogatories demanding information concerning certain "vertical water seal tests" undertaken on behalf of

76

the Petitioner it was apparent that such test concerned only the feasibility of the gas storage project in the case and the disclosure could not have led to any relevant evidence on the basis of the record before us. The record indicates that Defendants' technical witnesses had been supplied with virtually all of the pumping test results in connection with the Commission proceeding and it is difficult to see how Defendants were prejudiced in this respect. The court sustained objections to the offer of extracts from articles regarding "waterwall" experiments on the ground that they involved matters too remote and speculative and that the evidence was not properly presented, since nothing in the record justified the conclusion that such use could be made of the tracts in question. On the basis of the exhibits in the record it appears that the court was right in making such ruling.

 Condemnation was undertaken and justified on the principle of nonleakage of gas above the Maquoketa formation and noninterference with water supplies in the glacial drift or Silurian formations but only in the St. Peter formation and other strata covered by the gas storage easement. It is axiomatic that if leakage does in fact occur in the future which causes damage outside the easement area, nothing in this proceeding would preclude recovery for such damage if the action for recovery is otherwise on a sound basis authorizing recovery.

 Defendants also contend that they had the right to open and close in the case. At the same time they recognized that Petitioner has the burden of establishing the just compensation which Defendants are to receive. The ruling of the Trial Court in granting the right to Petitioner to open and close and in final arguments is consistent with previous rulings on the same issue in eminent domain cases (South Park Com'rs v. School Trustees, 107 Ill 489; McReynolds v. Burlington & O. R. Ry. Co., 106 Ill 152, 157).

We do not believe it would be helpful to extend by repetition the conclusions of this court as to contentions

made by Defendants which relate to or are similar to other contentions specifically discussed. A detailed analysis and further discussions of the contentions made by Defendants would require a repetition of conclusions stated in the course of the opinion and of the specific language of both the Peoples Gas Light & Coke Co. v. Buckles, supra, and Midwestern Gas Co. v. Mason, supra. We believe that the conclusions of the Supreme Court in these cases are precedents which are directly applicable to the cause before us. On the basis of such cases and on a review of the record, it is apparent that the jury awards should be sustained. The proper standards for consideration of damages and the evidence relating thereto were applied consistently with the precedents of the Buckles and Mason cases. The case was tried fairly and the damages awarded were consistent with the evidence. The record discloses no errors in the proceeding which would require reversal. Accordingly the judgment of the Circuit Court of Kankakee County will be affirmed.

Affirmed.

STOUDER and CORYN, JJ., concur.