CONSUMERS POWER COMPANY v. ALLEGAN STATE BANK

APPEAL OF NIENEKER TRUST

1. Eminent Domain—Public Utilities—Condemnation—Natural Gas Storage Field—Statutes.

Public utility condemning private property for use as a natural gas storage field must first acquire by any means other than condemnation at least 75%, computed in respect to surface area, of the property rights and interests in that underground field required for storage purposes (MCLA § 486.252).

2. Eminent Domain — Compensation — Constitutional Law — Courts — Powers — Court Rules.

Compensation for private property taken for public use must be determined in courts of record and a judge presiding in condemnation cases acts with the same powers that he has in other civil matters and should follow all court rules pertaining to civil trials, except as otherwise provided by specific statute (Const 1963, art 10, § 2; GCR 1963, 516.5).

---

References for Points in Headnotes

[1–23] Rights and liabilities with respect to natural gas reduced to possession and subsequently stored in natural reservoir. 94 ALR2d 543.

[1, 5, 7, 8, 11, 13, 15, 17–20] 26 Am Jur 2d, Eminent Domain §§ 57, 141.

27 Am Jur 2d, Eminent Domain § 348.

[2] 27 Am Jur 2d, Eminent Domain §§ 379, 380.

[3] 27 Am Jur 2d, Eminent Domain §§ 443–448.

[4] 26 Am Jur 2d, Electricity, Gas and Steam § 16.

[6, 22] 27 Am Jur 2d, Eminent Domain §§ 429, 430.

Admissibility on issue of value of real property of evidence of sale price of other real property. 118 ALR 869; 85 ALR2d 163.

[7, 12, 13] 27 Am Jur 2d, Eminent Domain §§ 435, 436.

[9] 27 Am Jur 2d, Eminent Domain § 267.

[10] 27 Am Jur 2d, Eminent Domain § 471.

[14] 27 Am Jur 2d, Eminent Domain § 375.

[16] 27 Am Jur 2d, Eminent Domain § 437.

[21] 27 Am Jur 2d, Eminent Domain § 267.

[23] 27 Am Jur 2d, Eminent Domain §§ 297, 298, 301.

Interest on damages for period before judgment for injury to, or detention, loss, or destruction of, property. 36 ALR2d 337.

3. Eminent Domain — Commissioners — Findings — Attorneys' Examination — Appeal and Error.

Permitting attorneys to question condemnation commissioners regarding the factors that they relied upon in determining just compensation and as to their specific determinations of fact was reversible error, since this procedure is neither authorized by law nor by judicial precedent.

4. Public Service Commissions—Public Utilities—Gas—Storage —Regulation.

A gas-supplying public utility is subject to regulation by the Michigan Public Service Commission except for its gas storage operations.

5. Eminent Domain—Public Utilities—Gas—Property Rights— Acquisition—Statutory Requirements.

Statutory requirement that gas-supplying public utility obtain at least 75%, by means other than condemnation, of rights of property surface for a proposed natural gas storage field means that it must acquire rights to minerals, rights to geological formations, and surface rights (MCLA § 486.252).

6. Eminent Domain—Public Utilities—Gas—Market Value— Witnesses—Expert.

Permitting defendant landowners' expert witnesses to base their opinions regarding the market value of defendants' property in part on what plaintiff public utility had paid lessees in the same area for their interests was improper because the lessees' and defendant landowners' interests were not similar, where the lessees by a special contract with plaintiff had been required to drill and core test their wells, to define the gas field, and to prove up the presence and extent of the gas storage field.

7. Eminent Domain—Public Utilities—Gas—Witnesses—Expert —Open Market Value.

Permitting defendant landowners' expert witnesses to consider, as a basis for their opinions on the value of defendants' property, the rents and profits that would accrue to plaintiff public utility from a completed and operating gas storage facility instead of the enhanced value of the owners' part of a natural gas container on the open market, was error.

8. Eminent Domain—Public Utilities—Gas—Witnesses—Expert —Uses of Property.

Court request that defendant landowners' expert witnesses consider gas production only as the highest and best use of de-

fendants' property, and court rejection of all other opinion testimony, was error in condemnation action by public utility to acquire gas storage rights.

9. EMINENT DOMAIN—DAMAGES—RULES.
Rules of damages in condemnation are that the condemnee shall receive the fair market value of the property taken at the time of taking.

10. EMINENT DOMAIN—DAMAGES—EVIDENCE—APPEAL AND ERROR.
An award in condemnation proceedings that is within the range of competent evidence of value will not be disturbed on review.

11. EMINENT DOMAIN—PUBLIC UTILITIES—GAS—STORAGE FORMATIONS—VALUE—DAMAGES.
Value of gas formations in land condemned for a gas storage field should be properly ascertained and awarded to the landowners.

12. EMINENT DOMAIN — DAMAGES — MARKET VALUE — ENHANCED VALUE.
That the value of condemned property has been enhanced because of the use for which that land has been appropriated will not be included in the measure of compensation unless it appears that the condemned property was exceptionally adapted and available for the use for which it was taken and that the necessity for such use was so imminent as to add something to its present value in the minds of possible buyers.

13. EMINENT DOMAIN — PUBLIC UTILITIES — GAS — DAMAGES — ENHANCED VALUE.
Landowners were entitled to the enhanced value of their property condemned by a public utility for a gas storage field where a utility spokesman admitted that Michigan is one of the few states in the north central and northeast part of the country having natural geological resources favorable for the underground storage of natural gas and that defendants' land would have been used by some gas utility for storage regardless of whether the condemnor used it.

14. EMINENT DOMAIN—PUBLIC UTILITIES—STATUTES—LEGISLATIVE INTENT.
Eminent domain, which permits the taking of private property for public use, is a harsh remedy, and requires a strict compliance with the condemnation statutes and the courts must construe those statutes in such a manner to effectuate their purpose, so as neither to defeat the legislative intent nor to lead to absurd results.

15. Eminent Domain—Public Utilities—Gas—Storage Fields—Damages.

> The right to condemn property rights in gas storage fields in Michigan is not limited to any one public utility, and the eligible public utilities cannot legally combine or agree to any arrangement that would permit them to acquire such gas storage rights for less than just compensation.

16. Eminent Domain—Public Utilities—Gas—Damages—Rights—Distinct Uses.

> Rights to minerals, including gas, to natural geological formations, and to surface areas are to be considered as separate and distinct uses in awarding just compensation to condemnees.

17. Eminent Domain—Public Utilities—Gas—Evidence—Production Purposes.

> A ruling restricting condemnation commissioners to a consideration of gas for production purposes only was error where the condemning public utility acquired title to all of the gas, not for production purposes but for use in connection with a gas storage field where foreign gas would be injected into the formation, mixed with the native gas and then withdrawn by the condemnor when desired or needed.

18. Eminent Domain — Public Utilities — Gas — Damages — Evidence —Enhanced Value.

> Permitting condemnation commissioners to consider expert testimony on the value of native gas on the basis that if it were not present in the condemned property the condemning public utility would have had to purchase foreign gas at an enhanced price was error, as such a consideration was based on an enhanced value supposition which was not present.

19. Eminent Domain—Public Utilities—Gas—Buffer Zone Gas—Compensation.

> Gas in a buffer zone or the periphery of condemned land should be compensated for on the same basis as the gas under the productive acreage, for the title to all mineral rights are acquired by a public utility under condemnation.

20. Eminent Domain—Public Utilities—Gas—Natural Formations—Market Value.

> Market value of natural gas formations can neither be taken away, destroyed, nor diminished by eminent domain proceedings under an applicable power and gas condemnation statute where a condemning public utility, by obtaining the statutorily required 75% of the property rights, had preempted the purchase of that property by other utilities (MCLA § 486.252).

21. EMINENT DOMAIN—MARKET VALUE—DEFINITION.

The market value of land or real estate is the highest price estimated in terms of money that the land will bring if exposed for sale in the free open market with a reasonable time allowed to find a purchaser buying with knowledge of all of the uses and purposes to which that land is adapted and for which it is capable of being used.

22. EMINENT DOMAIN—VALUE—COMPARABLE SALES.

Comparable sales, similar sales, and purchases of real property on the open market, without benefit of condemnation, can be used as proper comparables for an opinion on the market value of condemned property.

23. EMINENT DOMAIN—DAMAGES—INTEREST—ASSESSMENT.

No interest can be assessed on a condemnation award until there has been a taking of possession, either actual or constructive, of the condemned property by the condemnor.

Appeal from Allegan Probate Court, Dwight M. Cheever, J. Submitted Division 3 April 10, 1969, at Grand Rapids. (Docket No. 3,311.) Decided December 10, 1969. Rehearing denied February 2, 1970. Leave to appeal granted June 17, 1970. See 383 Mich 793.

Complaint by Consumers Power Company, a corporation, against Allegan State Bank, and other landowners, for condemnation of certain interests in land. Condemnation order granted. Defendants appeal. Reversed and remanded.

*Hoffman, McDonnald & Hoffman,* for plaintiff.

*John B. Nahan,* for defendants.

Before: QUINN, P. J., and HOLBROOK and T. M. BURNS, JJ.

HOLBROOK, J. This is an appeal[1] by defendants, the Nieneker Trust[2] and the Walter Webber interests[3] from the final condemnation awards for compensation as confirmed in the probate court for Allegan county, incident to the taking of certain interests in land[4] for gas storage purposes pursuant to MCLA § 486.252 *et seq.* (Stat Ann 1969 Cum Supp § 22.1672 *et seq.*). The area is called the Salem gas storage field.

The original petition in this matter was filed in the probate court November 2, 1961. Commissioners were duly appointed and after testimony was heard the commission filed their report finding necessity on April 10, 1962, which was confirmed on April 12, 1963. This order is not contested on appeal.

The hearing of just compensation was adjourned from time to time. A stipulation between the parties herein was signed October 4, 1963, providing that the date of taking for the purpose of determin-

---

[1] Except as to awards for the use of the surface, which are not the subject of this appeal.

[2] A group of landowners within the affected area who before the condemnation created the Nieneker Trust, granting to the named trustee the power to act fully in the premises for the landowners.

[3] Owners of 200 acres of land within the productive area.

[4] "All the rights, title and interests, in all the sands, strata, formations and horizons, and all gas, minerals and products contained therein, in formations lying between the top of the Bass Island formation and the base of the Salina formation, in and under the lands belonging to the owners, and all of the right, title, interest and estate of the owners, under and by virtue of any oil and gas mining leases now existing upon the lands, so far as said leases affect and include those formations lying between the top of the Bass Island formation and the base of the Salina formation including any delay rentals payable under such leases; and including royalties accrued and to accrue thereunder; and all gas, minerals and other products contained in said formations, in and under said land in the event that any such leases become cancelled, forfeited or terminated so far as said leases affect and include the formations lying between the top of the Bass Island formation and the base of the Salina formation, and the exclusive right to store natural gas from any source obtained, underground, in and under the said lands in said formations and exclusive right to use the surface to carry on the purposes * * *." Paragraph IV of plaintiff's petition.

ing just compensation be November 2, 1961. On October 8, 1963, plaintiff filed a petition for an order authorizing it to occupy the premises pending further proceedings. The petition was granted by order of the court filed on October 16, 1963.

On January 5, 1966, the petitioner moved to appoint new commissioners because the then present commissioners had just served on a similar condemnation case involving the Overisel gas storage field. Counsel for the Nieneker Trust joined in the motion and the probate judge granted the motion and appointed new commissioners on January 31, 1966.

On September 14, 1966, after hearing extensive testimony, the commissioners filed a report awarding just compensation for the taking of the property rights of *$404,866.93* to the Nieneker Trust and of *$74,156.28* to the Walter Webber interests. The defendants moved that these awards by the commission be confirmed. This motion was refused by the court. The plaintiff moved that the report except as to the surface awards be set aside because of the admission of claimed improper expert testimony as to value introduced by defendants and other claimed errors. The court granted the motion, set aside the report and referred the matter back to the commissioners to re-try under MCLA § 486.252e (Stat Ann 1969 Cum Supp § 22.1672[5]).

The hearings were then continued with additional testimony being heard and the commissioners reported a second time on January 6, 1967, awarding as just compensation for the taking, *$132,729.25* to the Nieneker Trust and *$37,656.28* to the Walter Webber interests.

On January 20, 1967, the probate court entered an order confirming the report of the commissioners. The defendants have taken this appeal.

Before considering the many issues raised on appeal we consider it proper to set forth the general law that we believe to be applicable to this condemnation case and also to state some of the background.

Authority for this condemnation suit is contained in § 2 of the act which is stated in part as follows:

"To condemn all lands, easements, rights of way, gas royalties, dry natural gas leaseholders, and other property and any and all interests therein * * * which may be necessary for pipeline rights of way or for an underground natural gas storage field or fields * * * . In any case where the petitioner seeks * * * for the purpose of acquiring any property or interest therein for use as a natural gas storage field, the petitioner shall first have acquired * * * by any means other than by condemnation, at least 75%, computed in respect to surface area, of the property rights and interests in the underground field required for storage purposes."

The hearings for determination of just compensation having commenced in 1966, the applicable fundamental law is set forth in Const 1963, art 10, § 2, which provides:

"Private property shall not be taken for public use without just compensation therefor being first made or secured in a manner prescribed by law. Compensation shall be determined in proceedings in a court of record."

Under this provision of the Constitution it has been ruled in the cases of *State Highway Commissioner* v. *Gulf Oil Corporation* (1966), 377 Mich 309; *State Board of Education* v. *von Zellen* (1965), 1 Mich App 147; and *State Highway Commissioner* v. *Snell* (1967), 8 Mich App 299, that the judge presid-

ing acts in condemnation cases with the same powers that he has in other civil matters. GCR 1963, 516.5 provides:

"Judges of courts of record in which condemnation proceedings have been instituted shall preside over the proceedings in person and shall instruct the jury or commissioners on questions of law and admissibility of evidence."

We conclude that the court in condemnation cases should follow all the rules pertaining to civil trials, except as otherwise provided by specific statute. After the commissioners filed their first report, the trial judge permitted the attorneys to question the commissioners as to the factors that they relied upon in determining just compensation and also to question them as to specific determinations of fact. We know of no precedent under the present law for such a procedure, nor have we been cited any authority by counsel. This procedure is objectionable, not authorized by law and was error.

The operation of a gas storage field in Michigan is uniform in purpose and operation. This statement is fortified in the testimony in this case and is succinctly set forth in the case of *Michigan Consolidated Gas Company* v. *Austin Township* (1964), 373 Mich 123, by Mr. Justice ADAMS on pp 129–132:

"The storage of gas in these underground gas storage fields may be defined as the storage in reservoirs of porous rock at various depths beneath the surface of the earth of large quantities of natural gas not native to those reservoirs. The storage fields are self-contained and natural gas can be stored indefinitely in them at high pressures. They are physically separated from plaintiff's transmission lines by surface facilities—dehydrators, gathering lines, compressors, meters, *et cetera*—which

are used to process the gas into the reservoir and to return it to the transmission lines.

"Base gas was injected into the storage fields. The purpose of the base gas is to keep out foreign material, including water, and to keep depleted gas fields as operating storage facilities. The amount of base gas remains a constant through the years except for any change in the pressure base, *but the base gas intermixes with other gas in the field*. Gas which is stored in the storage fields as injected *base gas* is accounted for as a *capital asset*. The additional gas which is injected into a storage field over and above the base gas is known as *inventory, current or working gas*. It is withdrawn from time to time to meet the needs of plaintiff's customers. The base gas could be withdrawn, but if it were water would come into the fields, making them inefficient.

"* * * *Gas that is injected into the fields from time to time intermixes with the gas already in the fields*. Since their use for storage, huge quantities of natural gas have always been stored in the fields in addition to the injected base gas and native gas.

"* * * The storage of the natural gas commences when gas is delivered to the field gathering system and ends when the gas enters the transmission lines to take it to market. Plaintiff's utilization of these reservoirs for storage of gas is no different from the utilization of facilities for the storage of any other commodity except for the difference in the nature of the commodity.

"The plaintiff's suppliers do not have sufficient pipeline capacity available to provide plaintiff with the gas required to meet cold weather space heating needs of plaintiff's customers, but have available a supply of gas in excess of plaintiff's customers' needs as their space heating requirements are minimized during warm weather. By the use of storage facilities, the plaintiff is able to store the excess pipeline supply and thereby utilize that excess to meet cold weather requirements of its customers.

"Storage capacity somewhat in excess of annual pipeline supply is desirable to provide for unpredictable factors such as business conditions, strikes, and abnormal winters. The storage program also tends to insure an adequate supply of gas in case of disruption in service bringing the gas from the southwest." (Emphasis supplied.)

The Salem storage field differs from the Austin storage field in that the Salem field did not have to be injected with purchased base gas, for it was already filled with native gas. The native gas was utilized for base gas and, because it intermixes with injected gas, it is utilized by the petitioner when it withdraws gas from storage for the market.

Petitioner herein, like other public utilities, is subject to regulation by the Michigan Public Service Commission *except for its storage operations.* *Michigan Consolidated Gas Company* v. *Austin Township, supra,* p 128.

The transcripts of the testimony comprise 6,000 pages; the briefs submitted are voluminous and exhaustive, approaching 700 pages. It is difficult to capsule the facts, but the effort may be rewarding.

Before November 2, 1961, the date of filing the petition, the Consumers Power Company had first agreed with the oil and gas lessees in the Salem field for the purchase of their interests, provided the lessees would drill wells and define the field, core test their wells, and do other things to prove up the presence and extent of the gas storage field. Upon fulfilling their contract the purchase was completed with the result that Consumers acquired about 99% of the lessees' interests in the field. Thereafter Consumers continued to purchase surface rights, the mineral (gas) rights, and formation rights from the landowners. At that time, the statute required a public utility to acquire, by other means than condemnation, 90% of the property

rights computed in respect to surface area. By PA 1961, No 69, § 1, the act was amended to read 75% instead of 90%. This provision was interpreted in the case of *Michigan Consolidated Gas Company* v. *Muzeck* (1966), 4 Mich App 502, and affirmed in *Michigan Consoliated Gas Co.* v. *Muzeck* (1967), 379 Mich 649, to mean: (1) rights to minerals, (2) rights to formations, and (3) surface rights. Before condemnation the petitioner was successful in acquiring by private purchase 76% or more of the three specified rights required of it.

The petition in condemnation sets forth that the Salem storage field covered 10,939 acres of surface area in Allegan and Ottawa counties; 10,459 in Allegan and 480 in Ottawa. The Salem gas storage field in Allegan county was made up of a production area of 4,900 acres which contained large quantities of native gas and a peripheral area of 5,559 acres called a "buffer" zone, not capable of natural gas production, but which could receive gas that might be injected at a greater pressure than the natural pressure present in the formation. The Nieneker Trust lands contained 869.6 net acres of storage land in the productive area including 803.4 net acres of mineral rights, and more than *900* acres in the buffer zone. The Walter Webber interests owned 200 acres, all in the productive zone. Reports as to the native gas in place in the field were obtained from Atwater, Cowan & Associates, consulting geologists, and were received in evidence and marked Exhibits D-3, D-3d, and D-3e. The reports indicated a very practical gas storage field, with 56,872,000 Mcf of native gas in place within the productive acreage.

Before attempting to purchase the landowners' interests in the Salem field, Consumers had purchased more than 75% of the Overisel storage field

from many of the landowners there. Consumers, before condemnation, offered to the landowners in the Salem field $200 per acre in the productive zone and $75 per acre in the "buffer" zone. Mr. Fruechtenicht, agent and witness for Consumers, explained the basis for these offers at the trial as follows:

"*Q*. Now how did you arrive or determine that the price of $200 per acre in the so-called production was a proper price or you would pay and a price of $75 per acre in the unproductive area was a price that you would pay?

"*A*. Well as to the $200 in the productive area, the value of 1/8th of the gas divided by the number of acres in the productive area in the Overisel Field and also in the Salem Field came out to a figure of approximately $192.50 per acre, and then we set the $7.50 that we had acquired other storage rights to that and the sum of those two made $200 per acre. As to the $75 an acre, we originally went in to acquire the nonproductive area at $25 per acre which would have been in our set up, $7.50 for storage and $17.50 for minerals, if any.

"*Q*. That was what price?

"*A*. $25 per acre.

"*Q*. Who did you talk to about that $25 per acre?

"*A*. Well that is the price we set that we thought would be a fair price and we approached the people in the nonproductive area.

"*Q*. Whereabouts?

"*A*. Overisel, and we could not negotiate on that figure. So then I came over to Overisel and did some checking and asked if there were any knowledgeable or thinking person to whom I could go and have them review the matter and advise me as to what they would accept as a rightful price, and I was referred to one Mr. Raymond Slotman.

\* \* \*

"*A*. So together with Mr. Klingenberg, I visited with Mr. Slotman and supplied him with some maps

of the Overisel Field and asked him or whomever he wished to ask to assist him and studied the area and recommend to me a price which he thought would be acceptable to the landowners in the field, and approximately ten days or two weeks, I again visited Mr. Slotman in the company of Mr. Klingenberg and he had done a considerable amount of work on at least one of the maps with a compass and he said that he felt if we offered $50 per acre for the first quarter of a mile adjacent to the field and $35 per acre for the second quarter of a mile which would complete a band of one well unit around the periphery of the field.

\*    \*    \*

"*A.* We gave this recommendation study and agreed if this were or could be accomplished at this price and would close out negotiations on the field that we would now again recontact everybody with this offer.

"*Q.* That was for $50?

"*A.* $50 for the first quarter of a mile and $35 for the second quarter of a mile. Again we were unsuccessful in completing any negotiations. However, as a result of this second call, we were lead to believe that if we would come back and offer $75 an acre, it would be accepted by all. Again we went back to Jackson and after some computations and consultations and discussions agreed if that were it, let's get the show on the road and get to work, and we offered $75 per acre. At that offer, we had some acceptances and then a complete refusal on the balance. Then, as I mentioned before, the Overisel prices having been offered in the area, there was absolutely no reason to come over into Salem with any lesser price.

"*Q.* Why not?

"*A.* Because it would not have been acceptable in my mind. Having set one price in an area for a certain price, you don't go and lower that price and

find an acceptance to it and on that basis that is how the $75 was arrived at and offered.

"*Q.* Why did you agree to pay $75 for the minerals and storage rights in the nonproductive area?

"*A.* We agreed to do that relying upon the assurance that we thought we had from the people that would negotiate on that basis and that would complete the acquisition of the field and we could turn our attention to other matters and get the field developed into the system."

On cross-examination Mr. Fruechtenicht testified as follows:

"*Q.* Now did you tell them the reserves in the entire field or one-eighth of the reserves?

\*          \*          \*

"*A.* What is shown in the Atwater report, 56,872, I think it is.

"*Q.* Then you told them to multiply that by one-eighth?

"*A.* I didn't tell them to multiply by one-eighth. I had that done and put it down on the blackboard. 56,872,000 Mcf.

\*          \*          \*

"*Q.* What did you do with that one-eighth figure or the seven eleven which it comes out to about?

"*A.* Then if you make your ratio between the productive and nonproductive, you will find that if you multiply the productive by 192.50 and the nonproductive by 67.50 you will arrive at a figure slightly in excess of what the value of the one-eighth of the Atwater reserves were.

"*Q.* Maybe I am skipping a few logical steps but are you saying that part of the 67.50 offered along with 7.50 or $75 included part of the gas that was under the productive area?

"*A.* In accordance with the Atwater report, yes, because it showed gas in place. You can't ignore that."

The defendants have advanced 32 questions to be considered on appeal and plaintiff has proffered in a counter-statement 14 questions for review. They deal mainly with the admissibility of evidence; instructions; what is permissible for the experts to use as a basis for their opinions on value; whether defendants were entitled to a mistrial; and the proper date from which interest should be computed on the awards.

This eight-year-old condemnation suit should be completed sometime and the rights of the litigants settled. If it were possible, it would be advisable for this purpose to affirm either the first or second report of the commissioners, but, alas, we find reversible error in the proceedings that brought about both reports. *Western Michigan University Board of Trustees* v. *Slavin* (1968), 381 Mich 23. For illustration but not by way of limitation of error: (1) in the proceedings concerning the first report, the court permitted the expert witnesses for defendants to base their opinions in part on what the petitioner had paid the lessees (producers) in the Salem field for their interests. This was improper because they were not similar interests, and a special contract was entered into requiring the lessees to define the field, core the wells, etc.; the experts were also permitted to consider as a basis for their opinions on value the rents and profits that would accrue to petitioner from a completed and operating gas storage facility instead of the enhanced value of the owners' part of a natural gas container on the open market; (2) in the proceedings concerning the second report, the court erroneously requested the defendant's expert witnesses to consider *production of the gas only* as the highest and best use of the property. All other opinion testimony was rejected.

In the case of *Michigan Consolidated Gas Company* v. *Muzeck* (1967), 8 Mich App 329, Judge QUINN stated on pp 332, 333:

"Since both sides concede that two of the rules on damages in condemnation in Michigan are that the condemnee shall receive the fair market value of the property taken, at the time of taking, and that any award within the range of competent evidence of value will not be disturbed on review, we find it unnecessary to cite authority for these propositions. The inquiry then becomes what competent evidence of value of the well and well equipment is in the record and is the revised award within the range thereof.

"Plaintiff argues that when it pays defendants $393,022 for gas in storage formations the well is a depleted well and the only value of it and the well equipment is the salvage value of $766. Its expert witness so testified, and it is apparent from the first report of commissioners that they accepted this evidence as the only evidence of value as to well and well equipment. We could accept this position if it was conclusively demonstrated that $393,022 represented payment for gas in storage formations and the cost of defendants' well, but it is not so demonstrated. The figure of $393,022 represents the value of defendants' share of unproduced gas in the field, and it is arrived at by multiplying defendants' share of the estimated gas remaining in place in the field by the factor 31.36 cents per Mcf of gas. Plaintiff's exhibits 16 and 17 and defendants' exhibits 2 and 3 demonstrate that plaintiff did not consider the price of 31.36 cents per Mcf for gas in place as including recovery of well costs. These exhibits are contracts of purchase by plaintiff from other owners of interests identical to those plaintiff obtained here by condemnation."

It is interesting to note that in both the original and the amended report, the commissioners award-

ed the landowner $7,162 as the value of the storage formation, including all minerals except gas. In *Muzeck, supra,* the defendants' land contained less than 36 acres and although the Belle River Mills gas storage field was much more prolific, comprising only 1,835 acres and was approximately equivalent to the 10,900 acres in the Salem gas storage field, the rules there observed are applicable herein. We conclude that in Michigan in a condemnation proceeding to acquire a gas storage field that the storage formations owned by the landowners have value which should be properly ascertained and awarded.

The general rule followed by the trial court to the effect that in a condemnation case the enhanced value due to the use for which the land is appropriated will not be included in the measure of compensation therefor, is subject to an applicable exception that appears after the statement of the general rule in 27 Am Jur 2d, Eminent Domain, § 282, on pp 77–79, which is as follows:

"On the other hand, where, entirely apart from the fact that the property was taken for a particular use, *it appears that it was exceptionally adapted and available for such a use,* as, for example, for a municipal water supply, or for a railroad, or for a bridge, and the necessity for such use was so imminent as to add something to the present value in the minds of possible buyers, that element may be considered in determining the fair market value. It must be such, however, as adds to the value in the open market. It has been held that if the value is enhanced from the possibility of the land coming into the market for the particular purpose, *rather than from the fact of its selection by the taker,* such enhancement may be considered. (Cited cases omitted.)

"Even though the increased market value is due to the adaptability of the property for valuable uses

in conjunction with other properties, it may be considered, if the practicability of the combination of all necessary properties on which such availability depends is at the time of the condemnation so great as probably to affect the public mind, and therefore increase the price which a purchaser might be expected to give.[5]  This rule is not, however, applied where the chance of different parcels of land being brought together by agreement or purchase, in such a way as to be available for the use, is to be regarded as too remote and speculative to have any legitimate effect upon the valuation.[6]"  (Emphasis supplied.)

The foregoing exception to the general rule can be properly applied to this case because the evidence supports it and the petitioner admits that the Salem gas storage field would have been used whether or not it was used by Consumers.  Testimony on the subject by Mr. Fruechtenicht is as follows:

"Michigan is one of the few states in the north central and northeast part of the country having

[5] *Olson v. United States* (1934), 292 US 246 (54 S Ct 704, 78 L Ed 1236) (stating the rule); *San Diego Land and Town Company v. Neale* (1888), 78 Cal 63 (20 P 372), later app 88 Cal 50 (25 P 977) (land for reservoir); *Brack v. The Mayor and City Council of Baltimore* (1915), 125 Md 378 (93 A 994) (stating the rule as to land having inherent value as a reservoir site); *Emmons v. Utilities Power Company* (1927), 83 NH 181 (141 A 65); 58 ALR 788 (potential value for development of waterpower in conjunction with other properties). *Re Lucas* (Eng, 1909) 1 KB 16 (CA). Annotation: 58 ALR 796; 106 ALR 968.

[6] *United States ex rel. Tennessee Valley Authority v. Powelson* (1943), 319 US 266 (63 S Ct 1047, 87 L Ed 1390).

*Olson v. United States* (1934), 292 US 246 (54 S Ct 704, 78 L Ed 1236) (in which it was not practicable for anyone other than the government to acquire the flowage easement in question, because of the facts that the body of water was located in two countries, that considerable portions of the shore were owned by sovereign proprietors, that other portions were occupied by Indian reservations, the lands of which might be disposed of only with the consent of the adult members of the tribe and by governmental authority, and that over 1,000 persons, the addresses of many of whom were unknown, were interested in the shore property); *New York v. Sage* (1915), 239 US

geological natural resources favorable for the underground storage of natural gas. No other method of gas storage has proven to be as economically sound and as physically possible as the storage of gas in original natural gas fields. Even here in Michigan the number of these fields is relatively few. To my knowledge, there is no field in the State of Michigan suitable for natural gas storage that has not been or is not being considered for eventual conversion to gas storage operations. Even the fields which have been discovered recently are under study. The use of gas storage fields make possible, as I've pointed out previously, the maximum use of pipeline facilities, bringing gas from the southwestern part of the United States and the Gulf Coast, this results in lower rates for gas to the people of Michigan."

In the many Federal court cases[7] cited by petitioner in support of its position that the general rule applies to this case the courts were presented with (1) a Federal condemnation statute and enforcement of the due process clause of the Federal Constitution, (2) a state condemnation suit wherein the owner invoked the protection of the due process clause by the 14th Amendment, or (3) where similar property rights had not been currently bought or sold without reliance on eminent domain to such an extent as to establish prevailing prices. Because the issues and the facts in these cases differ from those in the instant case they are not applicable.

---

57 (36 S Ct 25, 60 L Ed 143); *McGovern* v. *New York* (1913), 229 US 363 (33 S Ct 876, 57 L Ed 1228). Annotation: 58 ALR 797; 106 ALR 974.

[7] *New York* v. *Sage* (1915), 239 US 57 (36 S Ct 25, 60 L Ed 143); *McGovern* v. *New York* (1913), 229 US 363 (33 S Ct 876, 57 L Ed 1228). *Olson* v. *United States* (1934), 292 US 246 (54 S Ct 704, 78 L Ed 1236); *United States ex rel. Tennessee Valley Authority* v. *Powelson* (1943), 319 US 266 (63 S Ct 1047, 87 L Ed 1390); *Medina Valley Irr. Company* v. *Seekatz* (CA5, 1916), 237 F 805.

The Illinois cases[8] cited by petitioner are not analogous for the reasons that the Illinois condemnation statute is unlike Michigan's and the facts are dissimilar.

The case of *City of Allegan* v. *Vonasek* (1932), 261 Mich 16, is authority for sustaining the exception to the general rule because in *Vonasek* there was a disputed question whether the property condemned for waterpower purposes would have been so developed in the immediate future. This issue was properly submitted to the jury for consideration in awarding just compensation.

Our case can be better likened to *Emmons* v. *Utilities Power Company* (1927), 83 NH 181 (141 A 65), as reported in 58 ALR 788. *Emmons* is authority for the rule:

"In estimating the value of riparian rights taken by right of eminent domain, the owner is entitled to any enhanced market value due to its adaptability for valuable uses in conjunction with other properties, if the practicability of the combination of all the necessary properties on which such availability depends was at the time of condemnation so great as probably to affect the public mind, and therefore enhance the price which a purchaser might be expected to give."

The Court stated as reported on pp 185, 187 of 83 NH (793, 794 of 58 ALR):

"The defendant's taking of the plaintiff's undeveloped water power under the flowage act is an admission, so far as the properties of the parties are united in the defendant's proposed development, of the feasibility of such a combination, and a confession of its willingness to pay the plaintiff the fair market value of the property taken. Both parties

---

8 *Midwestern Gas Transmission Co.* v. *Mason* (1964), 31 Ill 2d 340 (201 NE2d 379); *Northern Illinois Gas Co.* v. *Weinrack* (1965), 66 Ill App 2d 60 (213 NE2d 411).

are in the market for such a combination, the defendant of its own volition, and the plaintiff by virtue of the defendant's exercise of the power of eminent domain.

\*    \*    \*

"A new situation has been created by the taking. The condemnor has eliminated *all uncertainty* of effecting the combination of the properties. But the issue is still, What was the market value of the land in its undeveloped and separate state? The test is always the market value of the land when taken, and 'not the value which it might have under circumstances different from those then existing.' " (Emphasis supplied.)

We reiterate what our Court said in the case of *State Board of Education* v. *von Zellen* (1965), 1 Mich App 147, 155:

"The law of eminent domain permitting the taking of private property for public use is a harsh remedy and, therefore, the courts have required strict compliance with the particular provisions of the law upon which the action was based."

In the case of *Michigan Consolidated Gas Company* v. *Muzeck* (1966), 4 Mich App 502, 509 it is stated:

"[S]tatutes, including condemnation statutes, must be construed in such a manner as to effectuate their purpose, not defeat the legislative intent, and not lead to absurd results."

The right to condemn property rights in gas storage fields in Michigan is not limited to any one public utility,[9] and the eligible public utilities cannot legally combine or agree to any arrangement that would permit them to acquire such gas storage rights for less than just compensation. The legislature in its wisdom required a public utility, before a petition for condemnation may be brought, to ac-

---

[9] MCLA § 486.254 (Stat Ann 1969 Cum Supp § 22.1674).

quire 75% of the property rights in a gas storage field by other means than condemnation. This law requires the public utility to negotiate and purchase in the market place, so to speak, for these property rights.

In the case at hand Consumers satisfied the requirements of the statute, including the showing of necessity, and was permitted to acquire the necessary property rights of defendants to complete the Salem gas storage field. Our Supreme Court by its ruling in *Michigan Consolidated Gas Co.* v. *Muzeck, supra,* has in effect determined the property rights that are to be considered in awarding just compensation for the taking, *viz.:*   (1) title to the minerals (gas), (2) all rights to the formations, and (3) rights to the surface. We rule that these rights are to be considered as separate and distinct uses in awarding just compensation.

As we read the record no one quarrels with the value of 20 cents per Mcf for the native gas in place nor with the determination that there were 56,872,-000 Mcf under the productive acreage in the Salem field. The owners' lands being subject to the usual 88-form oil and gas lease, their ownership in the minerals (gas) is 1/8 of the native gas in place. If all the parties agree that the landowners are to be paid for the native gas on the basis that the total gas under the productive zone is evenly distributed under the total acreage within the productive zone and defendants paid in proportion to what their acreage bears to the whole, then, in such case, a simple use of arithmetic may suffice to ascertain a proper award for the minerals in place to the defendants.

The ruling on the second hearing, by the trial judge, which restricted the commissioners to consider the value of the gas for productive purposes

only was contrary to law. The title to all of the gas was acquired—not for production purposes, but to use in connection with a gas storage field whereby foreign gas would be injected into the formation, mixing with the native gas and then withdrawn in accord with petitioner's desires and needs. Nor was it proper on the first hearing for the court to allow commissioners to consider expert testimony on the value of the native gas on the basis that if it were not present petitioner would have had to purchase foreign gas at an enhanced price and inject it into the formation as a base or cushion. This theory of enhanced value of the gas was based on a supposition that was not present.

If our conclusions of the facts as we read the record are unsatisfactory then a contest remains as to the market value of the gas under the productive acreage. This issue will have to be resolved by the commission from the evidence and expert testimony of its *market value* in accord with the rules laid down in the cases of *State Highway Commissioner* v. *Hessell* (1967), 5 Mich App 559; *State Highway Commissioner* v. *Green* (1967), 5 Mich App 583; and *State Highway Commissioner* v. *Hahn* (1968), 380 Mich 115, which also ruled that the owners were entitled to value of the minerals taken, determined as is and in place, and owners' compensation was not limited to difference between value of farm before taking of minerals therefrom and its value after the taking.

As to awarding just compensation for the minerals (gas) in the "buffer" zone or periphery these same rules should apply. The gas established to be under this land should be paid for on the same basis, for the title to all of these minerals was likewise acquired by petitioner under condemnation.

The market value of the formations or a part of the land is a more difficult question. We have ruled that the commissioners may consider the enhanced value on the open market of the formations because they are a part of the natural container and exceptionally adapted and available for the use of gas storage. Expert testimony as to the value to the condemnor of the completed and operating gas storage plant and facility considering rentals to be received and profits to be realized therefrom, as permitted at the first hearing, is not proper and is inadmissible.

Petitioner claims that inasmuch as it has had to acquire these formations by condemnation in order to assemble the gas storage field that the defendants have no right to have the commission consider the enhanced value of the formations, if any. Under the applicable statute, the use of eminent domain does not take away from or destroy the value of the property appropriated. The market value of the formations should not be diminished because of eminent domain but determined in relation to what they are worth on the open market. When Consumers obtained the 75% of the required property rights in the field for gas storage purposes, it preempted the purchase of the field by others, but, by so doing, did not change the rules for determining market value for the remaining property rights to be acquired by condemnation.

A definition of market value as relating to real property (the formations in question being real property) is found in 55 CJS, Market, p 798:

"*The market value of land or real estate* is the highest price estimated in terms of money that the land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all of the uses

and purposes to which it is adapted and for which it is capable of being used; the amount which land would bring if it were offered for sale by one who desired, but was not obliged, to sell, and was bought by one who was willing, but not obliged to buy; what the land would bring in the hands of a prudent seller, at liberty to fix the time and conditions of sale; what the property will sell for on negotiations resulting in sale between an owner willing but not obliged to sell and a willing buyer not obliged to buy; what the land would be reasonably worth on the market for a cash price, allowing a reasonable time within which to effect a sale."

The petitioner's expert witnesses testified that the formations had only token value, and that they had acquired many thousands of acres of formations for gas storage for $7.50 per acre. These purchases were made many years ago and mainly for storage rights in the shallower Michigan Stray and Marshall formations in central Michigan. The rule on the use of comparable land sales by experts in opinion evidence is set forth in the case of *State Highway Commissioner* v. *Schmidt* (1966), 3 Mich App 415, 419, 420:

"The comparable land sales used by the appraisers are not evidence; they are tools used by them to arrive at their estimate of a fair price and value for condemned property. The comparisons used by the appellants' appraisers were in the general vicinity of the land in dispute, as were the comparisons used by the appellee's appraisers. All land is unique. These were capable of, or suitable for, comparison with the land involved, although not identical. Such comparisons do not exist in fact or in reality, but need interpretation by the party using said comparisons."

Also, see *In re Brewster Street Housing Site* (1939), 291 Mich 313 and *State Highway Commissioner* v. *Snell* (1967), 8 Mich App 299.

Similar sales and purchases on the open market without benefit of condemnation, such as took place in the Overisel field and other similar Michigan storage fields could be used as proper comparables as a basis for an opinion on market value. The Ray field cannot be used as a comparable unless the purchase price for the entire fee can be reasonably divided so as to show the purchase price of the formation or formations.

The defendants assert that the probate judge abused his discretion when he refused to appoint a new commission upon the ground that one of the commissioners had mentioned to petitioner's counsel that Consumers may have improperly placed a pole on his property contrary to the easement he and his wife gave to Consumers at a time when the hearings on condemnation were in progress. This motion was made before the commissioners reported the first time. Subsequent to their report being filed, the defendants moved for confirmation. The commissioner was questioned by the attorneys and the court in chambers. He stated that the question of whether or not the pole was on his property had not caused him to be prejudiced for or against any of the parties involved. The judge determined that the incident was not of that significance that would require the court to dismiss the commissioner and appoint a new commission.

In the case of *Detroit Tug & Wrecking Company* v. *Wayne Circuit Judge* (1889), 75 Mich 360, 361, it was ruled that:

"The granting or refusing of a motion for a new trial is a matter which rests in the discretion of the trial court.

"To warrant this Court in interfering in matters so entirely in the sound discretion of the circuit court as the granting or refusing of a new trial, the abuse of discretion ought to be so plain that, upon consideration of the facts upon which the court acted, an unprejudiced person can say that there was no justification or excuse for the ruling made."

Although it was an unfortunate incident, inasmuch as defendants moved to confirm the report of this commission and because the trial court carefully considered the matter and exercised its discretion reasonably we find no abuse of discretion.

The trial judge awarded interest from October 16, 1963, the date of the order authorizing petitioner to take possession of the premises. Defendants contend the interest should have been figured from the date of the filing of the petition, November 2, 1961. The condemnation statute does not answer this issue. In *Campau* v. *City of Detroit* (1923), 225 Mich 519, it was ruled that under our constitution prohibiting the taking of private property for public use without just compensation, there can be no interest assessed until there is a taking, either actual or constructive. The taking in this case occurred when the petitioner was authorized to take possession. There was no error in the awarding of interest.

We have ruled on all the necessary questions posed on appeal and for the reasons herein stated we set aside the report of the commissioners and the order confirming the report, and return the matter to the probate court for Allegan county for further proceedings not inconsistent with this opinion.

Reversed. Costs to defendant and appellants.

All concurred.